**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

WARREN WESLEY SUMMERLIN,
            *Petitioner-Appellant,*

            v.

DORA B. SCHRIRO, Director of
Arizona Department of
Corrections,

            *Respondent-Appellee.*

No. 98-99002

D.C. No.
CV-86-00584-ROS

OPINION

On Remand from the United States Supreme Court

Argued and Submitted
March 22, 2005—San Francisco, California

Filed October 17, 2005

Before: Mary M. Schroeder, Chief Judge, and
Harry Pregerson, Stephen Reinhardt,
Diarmuid F. O'Scannlain, Michael Daly Hawkins,
Sidney R. Thomas, M. Margaret McKeown,
Kim McLane Wardlaw, William A. Fletcher,
Raymond C. Fisher, and Johnnie B. Rawlinson,
Circuit Judges.

Opinion by Judge Thomas;
Partial Concurrence and Partial Dissent by
Judge O'Scannlain

14157

## COUNSEL

Ken Murray and Leticia Marquez, Federal Public Defender's Office, Phoenix, Arizona, for the petitioner-appellant.

John Pressley Todd, Attorney General's Office, Phoenix, Arizona, for the respondent-appellee.

---

## OPINION

THOMAS, Circuit Judge:

In this appeal we consider whether petitioner received ineffective assistance of counsel at the penalty phase of his capital murder trial. We conclude that he did and reverse the judgment of the district court denying a writ of habeas corpus.

I

Extraordinary plot lines rarely end; they frequently reappear in sequels. Thus, this case returns to us from the Supreme Court for us to write the next chapter in this unusual saga.

We need not recount the prior episodes in detail; the underlying factual and procedural history is chronicled in our prior opinion. *Summerlin v. Stewart ("Summerlin I")*, 341 F.3d 1082, 1084-92 (9th Cir. 2003) (en banc). In brief, Warren Summerlin was convicted of the murder of Brenna Bailey by a jury and was sentenced to death by a state judge. The Supreme Court of Arizona reviewed and affirmed Summerlin's convictions and his sentence. *See State v. Summerlin*, 675 P.2d 686 (Ariz. 1983), *recons. denied* Jan. 17, 1984. After an initial petition for writ of habeas corpus in federal district court and four unsuccessful post-conviction attempts in state court to overturn his conviction, Summerlin filed a

second amended petition for writ of habeas corpus in the federal district court in Arizona on November 22, 1995. *See* 28 U.S.C. § 2254 (1994). The federal district court denied Summerlin's second amended petition for writ of habeas corpus on October 31, 1997. Pursuant to Fed. R. Civ. P. 59(e), Summerlin moved to vacate the judgment on November 28, 1997. The district court denied this motion on January 12, 1998, but issued a certificate of probable cause enabling Summerlin to appeal pursuant to Fed. R. App. P. 22(b)(1). This timely appeal followed.

A divided three-judge panel of this Court issued its opinion on October 12, 2001, affirming the district court in part and reversing in part. *See Summerlin v. Stewart*, 267 F.3d 926 (9th Cir. 2001), *withdrawn*, 281 F.3d 836 (2002). The case was remanded for an evidentiary hearing as to whether the state trial judge was competent when he was deliberating on whether to impose the death penalty. *Id.* at 957.

In the interim, before the mandate issued in the appeal, the United States Supreme Court held that Arizona's death penalty statute violated the Sixth Amendment because the penalty of death was imposed by a judge, rather than a jury. *Ring v. Arizona*, 536 U.S. 584, 609 (2002). We granted rehearing *en banc* to consider, *inter alia*, the potential retroactive effect of *Ring*. After rehearing *en banc*, we upheld Summerlin's conviction, but also held that *Ring* applied retroactively so as to require that the penalty of death imposed upon Summerlin be vacated. *Summerlin I*, 341 F.3d at 1121. The Supreme Court granted a writ of certiorari in part, *Schriro v. Summerlin*, 540 U.S. 1045 (2003), and reversed *Summerlin I*, holding that *Ring* did not apply retroactively to cases already final on direct review. *Schriro v. Summerlin*, 124 S.Ct. 2519, 2526 (2004). The Court remanded the remaining sentencing issues, namely:

    1.   Whether Summerlin received ineffective assistance of counsel during the sentencing phase of

his capital trial in violation of his rights under the Sixth Amendment;

2.  Whether Summerlin's court-appointed public defender had a conflict of interest that adversely affected her representation at a critical stage of the proceedings, in violation of his rights under the Sixth Amendment;

3.  Whether Summerlin was deprived of his right to due process of law because the trial judge was addicted to marijuana during his trial and deliberated over his sentence while under the influence of marijuana; and

4.  Whether cumulative errors require reversal of his sentence.

Because the petition for a writ of habeas corpus was filed before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), pre-AEDPA law governs our consideration of the merits of the claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1494 (9th Cir. 1997) (en banc). Under pre-AEDPA law, we consider a claim alleging ineffective assistance of counsel as a mixed question of law and fact that we review *de novo*. *Rios v. Rocha*, 299 F.3d 796, 799 n.4 (9th Cir. 2002). We review the district court's denial of Summerlin's habeas petition *de novo* and the district court's factual findings for clear error. *Id.* Because this is a pre-AEDPA case, we do not review the state court's legal conclusions to determine whether they are "objectively unreasonable;" rather, we "simply resolve the legal issue on the merits, under the ordinary rules." *Belmontes v. Brown*, 2005 WL 1653620, *1 (9th Cir. July 15, 2005); *see also id.* (" '[A]n unreasonable application of federal law is different from an incorrect application of federal law.' " (quoting *Williams v. Taylor*, 529 U.S. 362, 365 (2000) (plurality opinion)). We

owe less deference to state court factual findings under pre-AEDPA law, but "we must still presume such findings to be correct unless they are 'not fairly supported by the record.' " *Bean v. Calderon*, 163 F.3d 1073, 1087 (9th Cir. 1998) (quoting 28 U.S.C. § 2254(d)(8) (1996)).

## II

The first sentencing issue is whether Summerlin received constitutionally effective assistance of counsel at sentencing. We conclude that he did not, requiring reversal of the district court order denying the petition for a writ of habeas corpus.

## A

**[1]** The Sixth Amendment right to counsel in a criminal trial includes "the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). This right extends to "all critical stages of the criminal process," *Iowa v. Tovar*, 541 U.S. 77, 80-81 (2004), including capital sentencing, *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002). Indeed, "[b]ecause of the potential consequences of deficient performance during capital sentencing, we must be sure not to apply a more lenient standard of performance to the sentencing phase than we apply to the guilt phase." *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992).

To prevail on his claim of ineffective assistance of counsel during the penalty phase of his trial, Summerlin must demonstrate first that the performance of his counsel fell below an objective standard of reasonableness at sentencing, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

**[2]** The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has]

emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688). However, general principles have emerged regarding the duties of criminal defense attorneys that inform our view as to the "objective standard of reasonableness" by which we assess attorney performance, particularly with respect to the duty to investigate. For example, the Supreme Court has cited with approval the ABA Standards for Criminal Justice as indicia of the obligations of criminal defense attorneys. *Rompilla v. Beard*, 125 S.Ct. 2456, 2465-66 (2005); *Williams*, 529 U.S. at 396; *see also Wiggins*, 539 U.S. at 524 (noting that "we have long referred [to the ABA standards] as 'guides to determining what is reasonable' " (quoting *Strickland*, 466 U.S. at 688)). The standards in effect at the time of Summerlin's trial clearly described the criminal defense lawyer's duty to investigate, providing specifically that:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980).

[3] The duty to investigate is critically important in capital penalty phase proceedings. In a capital case, a criminal defendant has a constitutionally protected right to provide the jury with mitigating evidence. *Williams*, 529 U.S. at 393. Accordingly, a criminal defense attorney has a duty to investigate,

develop, and present mitigation evidence during penalty phase proceedings. *Wiggins*, 539 U.S. at 521-23. "To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.' " *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc) (quoting *Williams*, 529 U.S. at 399).

**[4]** Although we must defer to a lawyer's strategic trial choices, those choices must have been made after counsel has conducted "reasonable investigations or [made] a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. During penalty phase proceedings, counsel has a duty to make a "diligent investigation into his client's troubling background and unique personal circumstances." *Williams*, 529 U.S. at 415 (O'Connor, J., concurring). As the Supreme Court has stated, there is a "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Boyde v. California*, 494 U.S. 370, 382 (1990) (quotation and emphasis omitted). Thus, as we have noted, " '[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase.' " *Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999) (quoting *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) (brackets in original)).

**[5]** To that end, the investigation should include inquiries into social background and evidence of family abuse. *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005). We have long "recognized an attorney's duty to investigate and present mitigating evidence of mental impairment." *Bean*, 163 F.3d at 1080 (citing *Evans v. Lewis*, 855 F.2d 631, 636-37 (9th Cir. 1988)). This includes examination of mental health records. *Deutscher v. Whitley*, 884 F.2d 1152, 1161 (9th Cir. 1989). Defense counsel should also examine the defendant's physical

health history, particularly for evidence of potential organic brain damage and other disorders. *Stankewitz v. Woodford*, 365 F.3d 706, 723 (9th Cir. 2004).

**[6]** The defendant's history of drug and alcohol abuse should also be investigated. *Jennings v. Woodford*, 290 F.3d 1006, 1016-17 (9th Cir. 2002). Defense counsel should also personally review all evidence that the prosecution plans to introduce in the penalty phase proceedings, including the records pertaining to criminal history and prior convictions. *Rompilla*, 125 S.Ct. at 2465; ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980). It should go without saying that defense counsel needs to meet with his client to discuss the preparation of the penalty phase defense. *See Silva*, 279 F.3d at 847 (counsel has a duty to try to persuade defendant to present mitigating evidence and counsel cannot make a reasoned tactical decision if he does not even know what evidence is available).

This list is not meant to be exhaustive, but only illustrative of the minimal type of "objectively reasonable" investigation any competent capital defense attorney should conduct in preparing a penalty phase defense, even at the time Summerlin's case was tried.

The record shows that Summerlin's attorney utterly failed in his duty to investigate and develop potential mitigating evidence for presentation at the penalty phase. He conducted no investigation of Summerlin's family and social history. He did not speak with Summerlin's family or friends. His development of a mental health defense was based solely on the limited information developed at Summerlin's pre-trial competency examination, which was prepared for an entirely different purpose. *See Bean*, 163 F.3d at 1078 (not reasonable to rely at penalty phase on mental health material previously amassed for competency challenge); *see also Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995) (investigation

of mental health evidence for guilt phase does not excuse failure to develop mental health evidence for penalty phase).

Had Summerlin's attorney conducted even a minimal investigation, he would have been able to develop testimony about Summerlin's tortured family history, including the fact that Summerlin's alcoholic mother beat him frequently and punished him by locking him in a room with ammonia fumes. Counsel would have learned that, at his mother's behest, Summerlin received electroshock treatments to control his explosive temper. Summerlin's attorney would also have discovered that Summerlin had a learning disability that left him functionally mentally retarded. An adequate investigation would have revealed that Summerlin had been diagnosed as a paranoid schizophrenic and treated with anti-psychotic medication.

Summerlin's trial counsel did not develop any mental health defense himself; rather, he relied on information uncovered by Summerlin's prior attorney to determine competency and to explore a potential mental disease guilty phase defense. Counsel's lack of understanding of the basics of the potential guilt phase defense, and its more effective use as mitigation evidence at the penalty phase, was demonstrated during post-conviction hearings:

> Q. Did you ever talk to any other doctor or expert witness about psychomotor seizures?
>
> A. No.
>
> Q. Did you do any research regarding psychomotor seizures?
>
> A. No.
>
> Q. Did you ever learn that Warren Summerlin had organic brain damage?

A.  I believe that that appeared somewhere in the medical reports. I'm not sure. It sounds familiar at this time.

Q.  What significance was the fact that he had organic brain damage to you?

A.  Well, I — if I knew at the time, I don't know now. So I guess I would have to say I don't remember.

Q.  Were you aware of any relationship between organic damage and psychomotor seizures?

A.  At this time, I'm not. I just don't have any memory of being aware of such a thing.

Q.  Did you ever learn while you were preparing for trial that Warren Summerlin had had mumps at birth?

A.  I don't remember, but I don't believe so.

Q.  Dr. Bendheim and Dr. Tuchler were the Rule 11 examining doctors?

A.  Okay.

Q.  Did you ever talk to Dr. Bendheim before the trial?

A.  No.

Q.  Did you ever talk to Dr. Tuchler before the trial?

A.  No.

Q. Did you talk to Dr. Winegrad, a neurologist before the trial?

A. No.

[7] In short, Summerlin's attorney failed to investigate the available evidence concerning possible mental health mitigation either prior to the guilt phase trial or the penalty phase hearing, clearly missing critical mitigation evidence. Summerlin's prior attorney had investigated Summerlin's mental health and communicated the results to his trial attorney. The preliminary mental health information was in the hands of Summerlin's attorney, yet he failed to do any further investigation or development of this critical mitigation evidence. "[W]here counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." *Hendricks*, 70 F.3d at 1043; *see also Wallace v. Stewart*, 184 F.3d 1112, 1115-16 (9th Cir. 1999) (holding ineffective an attorney who spent just over two hours total interviewing potential witnesses, including just over thirty minutes with a psychiatric expert, and failed to contact known and willing witnesses); *Seidel v. Merkle*, 146 F.3d 750, 756 (9th Cir. 1998) (finding ineffective assistance where defense counsel "failed to conduct even a minimal investigation in order to make an informed decision" regarding his client's mental health defenses).

Although Summerlin's trial attorney knew that the prosecution planned in the penalty phase hearing to call as witnesses the two psychiatrists the court had appointed to evaluate Summerlin's competency, he did not contact or interview either of them. As he testified:

Q. Did you know in advance of the aggravation/ mitigation hearing that the State was calling Dr. Bendheim and Dr. Tuchler as witnesses?

A.   I don't know whether I knew that in advance or not.

Q.   Showing you Exhibit 83, and the Clerk's record in 119502, which appears to be a letter dated June 24th, 1982 from Jessica Gifford to you, would you take a minute to review it?

A.   All right. I've reviewed it.

Q.   Does it indicate that Miss Gifford was advising you by that letter that she would be subpoenaing Dr. Bendheim and Dr. Tuchler for the aggravation/ mitigation hearing?

A.   It does so indicate.

Q.   Mr. Klink, the aggravation/mitigation hearing took place on July 8th —

A.   July 8th.

Q.   — July 8th of 1982. Did you talk to Dr. Bendheim before July 8th, 1982?

A.   Not before July 8th, I don't believe.

Q.   Did you talk to Dr. Tuchler before July 8th, 1982?

A.   I don't believe so.

[8] Failure to review evidence that the attorney knows the State will produce at a penalty phase trial falls below an objective standard of reasonableness for performance in preparing for a penalty phase defense. As the Supreme Court recently observed in *Rompilla*:

The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense. As the District Court points out, the American Bar Association Standards for Criminal Justice in circulation at the time of Rompilla's trial describes the obligation in terms no one could misunderstand in the circumstances of a case like this one:

"It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities."

125 S.Ct. at 2465-66.

The Supreme Court termed counsel's failure to investigate evidence that counsel knows the State will use against the defendant at the penalty phase trial "an obvious reason" to conclude that counsel's performance "fell below the level of reasonable performance." *Id.* at 2464. As the Court further noted:

With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation.

*Id.* at 2465.

**[9]** In this case, just as in *Rompilla*, the failure of the defense attorney to investigate evidence the State planned to

introduce at the penalty phase trial constituted constitutionally
deficient performance.

During the one month interval between the trial and the
death penalty phase hearing, Summerlin's attorney never once
met with his client. As his attorney testified in post-conviction
proceedings:

> Q.   * * * * During that period of time between the
> verdict and the aggravation/mitigation hearing, how
> many times did you meet with Warren Summerlin?
>
> A.   I don't remember.
>
> Q.   As a court appointed counsel did you keep con-
> temporaneous time records in connection with this
> case?
>
> A.   That's correct, as best I could.
>
> Q.   I'm showing you four separate documents. Do
> they appear to be the time records in this case — in
> these cases?
>
> A.   They do.
>
> Q.   Okay. Would reviewing those refresh your rec-
> ollection as to how many times you saw Mr. Sum-
> merlin   between   verdict   and   the   aggravation/
> mitigation hearing?
>
> A.   Yes, I'm sure I would have recorded that time
> if I had met with him.
>
> Q.   Take a look at those documents, then tell us
> how many times you saw Warren Summerlin
> between the verdict and the aggravation/mitigation
> hearing?

\* \* \* \* \*

A. \* \* \* It does not appear that I met with Mr. Summerlin after the date of the verdict, until we got to court, for the mitigation aggravation hearing.

[10] "Adequate consultation between attorney and client is an essential element of competent representation of a criminal defendant." *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983). We have held that limited consultations may constitute deficient performance by a criminal defense attorney. *See Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998) ("Counsel's admission that he spent at most forty-five minutes with Turner prior to trial demonstrates deficient performance . . . [and] is especially shocking in light of the seriousness of the charges"); *Correll v. Stewart*, 137 F.3d 1404, 1412 (9th Cir. 1998) (finding counsel's performance deficient when the attorney only met with the defendant for five minutes between the guilt and penalty phases). In this case, in the one month interval between the guilt and penalty phase proceedings, there were no consultations at all. *See Silva*, 279 F.3d at 847 (counsel has a duty to try to persuade defendant to present mitigating evidence and counsel cannot make a reasoned tactical decision if he does not even know what evidence is available).

[11] These are precisely the failings that both the Supreme Court and our Circuit have held constitute deficient performance of counsel under the Sixth Amendment. Summerlin's penalty phase counsel did not conduct any independent investigation, not even consulting with his client. There is no explanation for this in the record. His failure to investigate falls far short of any objectively reasonable standard against which we might measure attorney performance under the standards of the Sixth Amendment.

B

[12] A capital defense attorney not only has the duty to investigate potential mitigation defenses, but to present them.

As we have put it bluntly: "Failure to present mitigating evidence at the penalty phase of a capital case constitutes ineffective assistance of counsel." *Bean*, 163 F.3d at 1079; *see also Correll*, 137 F.3d at 1412 (finding counsel's performance deficient when the attorney failed to call any mitigation witnesses despite knowing people who were willing to testify, and barely raised the defendant's psychiatric history as a mitigating factor).

In this case, Summerlin's attorney did not present any mitigating evidence during the penalty phase, but instead suggested that the sentencing judge review Dr. Tatro's pre-trial guilt phase report, which was appended to the presentence report. The penalty phase trial was an extremely short proceeding, extending only twenty-six transcript pages, more than half of which constituted colloquy between counsel and the court. The court first entertained argument on the defense motion for a new trial, which the judge indicated he would consider over the weekend. For its case in aggravation, the State argued that two statutory aggravating factors existed: (1) a prior felony conviction involving the use or threat of violence; and (2) that the instant capital crime was especially heinous, cruel, or depraved. The State's aggravation case consisted of only one exhibit, specifically certified copies of documents relating to the aggravated assault conviction. The State then asked the judge to consider the trial testimony and rested its case. The entirety of the State's aggravation case was recorded in one page of transcript.

For the defense case in mitigation, Summerlin's attorney called one of the prior attorney's consulting psychiatrists to the stand to testify. However, before the witness could be sworn in, Summerlin interrupted and—although the conversation is not in the trial transcript—apparently requested that his attorney not present the witness. Counsel requested a five-minute recess, at the conclusion of which he stated: "With the consent of the Defendant, the Defendant has no witnesses in mitigation at this time and . . . we'll rest."

The judge reminded Summerlin and his attorney that this was the time set aside for the aggravation and mitigation hearing and that he planned to proceed with sentencing the next Monday. The judge then said, "So you tell me that you have one witness that you may present on Monday?" Summerlin's attorney replied: "Well, I would not call any witnesses at all." The judge indicated that he would allow Summerlin to make any statement that he wished to make, either at the present hearing or on Monday. Subsequently in the hearing, Summerlin's attorney stated he would rely on Dr. Tatro's report appended to the presentence report. The State proceeded by presenting two rebuttal psychiatric witnesses. Counsel's argument against a death sentence for his client took up all of three pages of transcript.

The net result was that Summerlin presented no affirmative evidence and no rebuttal evidence, although—as we have discussed—there was an abundance of available classic mitigation evidence concerning family history, abuse, physical impairments, and mental disorders.

In addition, there was significant mitigation concerning one of the two statutory aggravating factors: his conviction for aggravated assault. That conviction arose out of a road rage incident in which a car veered off the road, jumped the curb and struck Summerlin's wife, who was hospitalized for her injuries. At the scene, Summerlin brandished a pocket knife at the errant driver, an act that occasioned the filing of the criminal assault charge. The victim was not physically injured in any way. Summerlin's attorney knew of these mitigating factors because he had defended the charge. However, he did not present any of this mitigation evidence to the sentencing judge. As the attorney testified later:

> Q.   Mr. Klink, did you believe that there was some mitigating circumstances in connection with the aggravated assault conviction?

A.   Well, I think we discussed before we came in here, and there was [sic] some mitigating circumstances that were discussed or talked about with Judge Riddel at the sentencing on the aggravated assault charge. Now, with respect to your question, did I believe there was any mitigating circumstances with respect to the conviction about which we are here today?

Q.   With respect to the conviction of the aggravated assault?

A.   Well, yes. I discussed them, I believe, in front of Judge Riddel [the sentencing judge on the aggravated assault conviction]. I'm not sure, but I demonstrated — I tried to present some mitigating factors, yes.

Q.   Did you ever present any mitigating factors in connection with that conviction to Judge Marquardt [the sentencing judge in the capital case]?

A.   No.

Q.   In connection with that aggravated assault case, was the victim Mary Lavus ever physically injured by Warren Summerlin?

A.   No, I don't believe so.

Q.   She suffered no physical injury?

A.   I don't believe so, no.

* * * * *

Q.   He did not physically harm her?

A. That's correct.

Q. You recall why Warren Summerlin approached the driver of that automobile?

A. Right. As I recall, it was a reaction to the fact that this lady either had lost control of the car or her brakes had failed, or some such thing like that, resulting in the car knocking over Mr. Summerlin's wife and knocking her into a glass window of a store front, I believe. And that's what precipitated the reaction of Mr. Summerlin in commiting the offense.

**[13]** In sum, Summerlin's penalty phase attorney knew of essential mitigating evidence concerning the key special circumstance urged by the prosecution, but did not present this mitigation evidence at the penalty phase. The prosecution's introduction of a certified copy of the aggravated assault conviction was the only evidence received by the sentencing court; the defense offered no mitigation or other rebuttal evidence to counter the State's case in aggravation.

Summerlin's attorney apparently also failed to object or make any arguments concerning the presentence report. The presentence report was prepared by a probation officer who did not testify during the penalty phase. It contained numerous sentencing recommendations from the victim's family and friends, police officers, and others. Attached to the presentence report were a large number of letters from members of the community expressing their opinions, including a petition with over 500 signatories. The presentence report also contained the probation officer's opinion as to the heinous nature of the crime and expressed her opinion that the judge should impose the death sentence. All of the material contained in the report constituted hearsay, inadmissible evidence. Almost all of it was damaging to the defendant. Not only did Summerlin's attorney fail to object to its consideration, but he commended the presentence report to the sen-

tencing judge for review by urging the judge to review the Tatro letter attached to it.

**[14]** "The failure to present mitigating evidence during the penalty phase of a capital case, where there are no tactical considerations involved, constitutes deficient performance, since competent counsel would have made an effective case for mitigation." *Smith v. Stewart*, 189 F.3d 1004, 1008-09 (9th Cir. 1999). Summerlin's counsel has presented no tactical explanation for his decision not to present mitigating evidence. His failure fell below the objective standards of reasonableness for attorney conduct in a penalty phase trial. Summerlin did not have the effective assistance of counsel at his penalty phase guaranteed by the Sixth Amendment. *See Rompilla*, 125 S. Ct. at 2465 n.5 ("We may reasonably assume that [the sentencer] could give more relative weight to a prior violent felony aggravator where defense counsel missed an opportunity to argue that circumstances of the prior conviction were less damning than the prosecution's characterization of the conviction would suggest.").

C

The State contends that none of this is relevant because Summerlin requested that mitigating evidence not be presented in his defense. The record does not support such a dismissive view of Summerlin's position. At the commencement of the penalty phase hearing, Summerlin's attorney called psychologist Tatro to the stand. Summerlin apparently objected to this, and the following colloquy ensued:

> THE COURT: All right. Come forward and be sworn, please. Your client wants to ask a question.
>
> MR. KLINK: Well, your honor, may we approach the bench?
>
> THE COURT: All right.

(An off the record discussion at the bench ensued, outside the hearing of the court reporter.)

THE COURT: At the request of defense counsel and his client, the client would like to have a couple of minutes to talk over the calling of this witness.

* * *

MR. KLINK: All right, your honor. With the consent of the defendant, the defendant has no witnesses in mitigation at this time and—

THE COURT: This will be—

MR. KLINK: —and we'll rest.

* * *

MS. GIFFORD (The Prosecutor): Your honor, it's my understanding—at least my impression—that this is the defendant's decision that he does not wish certain witnesses to be called. Could we have that reflected on the record, perhaps, because—

THE COURT: I think it has been, and Mr. Summerlin, I'll address you directly, to make sure that—for any error that might possibly be claimed at this time —to make sure that you understand that you are facing a potential decision between either life imprisonment or the death penalty, and this is the time in which you must decide whether you present any mitigation witnesses on your behalf.

This is your entitlement. Your lawyer has told me that at this time you do not wish to, and he is telling me that you do not wish to call any mitigation witnesses. If this is correct I'll accept your decision.

But I want it to be very clear that this is the time, and only time, that you'll be able to have to do this.

So you don't even need to respond to me. You understand what I'm telling you?

THE DEFENDANT: Yes.

The actual conference between attorney and client is not on the record, and Summerlin's attorney has no recollection of it. As he later testified:

Q. Does [review of the transcript] refresh your recollection as to what occurred on that date?

A. It doesn't refresh it. But the — what is indicated in here, I have no dispute that it took place.

Q. It is indicated that you did, in fact, verbally call Dr. Tatro to the stand?

A. It does so indicate.

Q. And then, at that point, there was some kind of conference with your client, Mr. Summerlin?

A. It does so indicate.

Q. And you had some discussion. At the conclusion of that discussion, Dr. Tatro, the witness, was withdrawn. And your client apparently was informed of his right to call any witnesses in mitigation, and he declined that right?

A. It appears from the record that that is the case. The discussion I had with him after Dr. Tatro was called as a witness, I have absolutely no recollection of what took place during that discussion. I wish I

can, it might be very enlightening for one side or the other.

**[15]** Summerlin did not testify as to the content of the conversation. As a result, there is no record of what Summerlin said, much less that he instructed his attorney not to present any penalty phase defense whatsoever. Thus, the characterization of this exchange as one of a client directing an attorney not to present a penalty phase defense is not supported by the record. Summerlin spontaneously objected to the presentation of one witness; there is no indication that he was instructing his attorney not to present any mitigating evidence and no aggravation rebuttal. In fact, Summerlin's counsel later clarified that Summerlin wished to rely on Dr. Tatro's earlier evaluation, which had been appended to the presentence report. Summerlin also expressed that he "had great faith in Dr. Garcia," a psychiatrist who had examined Summerlin during the pre-trial period, indicating that he might not be adverse to the presentation of mental health evidence at the penalty phase hearing. This type of record is insufficient to establish that Summerlin wished to waive a mitigation defense or prevent the introduction of mental health evidence. *See Silva*, 279 F.3d at 839-40 (noting that the record did not support the conclusion that Silva precluded counsel from investigating any and all aspects of Silva's background; Silva merely instructed counsel not to call Silva's parents as witnesses during the penalty phase); *see also Stankewitz v. Woodford*, 365 F.3d 706, 721-22 (9th Cir. 2004) (defendant's opposition to calling family members or experts as witnesses does not excuse an attorney from interviewing experts and family members or from investigating documents containing mitigating evidence); *cf. Williams v. Woodford*, 384 F.3d 567, 621-22 (9th Cir. 2004) (the district court expressly found that Williams instructed counsel not to call any witness at the penalty phase, rejecting Williams's contention that he had merely instructed counsel not to call his parents).

**[16]** However, even if Summerlin had instructed counsel not to present a mitigation defense, that fact would have no

effect on the deficient conduct prong of *Strickland* because counsel had already demonstrated ineffectiveness by failing to thoroughly investigate the existence of mitigating factors. Although the allocation of control between attorney and client typically dictates that "the client decides the 'ends' of the lawsuit while the attorney controls the 'means,' " Marcy Strauss, *Toward a Revised Model of Attorney-Client Relationship: The Argument for Autonomy*, 65 N.C. L. Rev. 315, 318 (1987), it does not relieve an attorney of the duty to investigate potential defenses, consult with the client, and provide advice as to the risks and potential consequences of any fundamental trial decision within the client's control.

**[17]** This is especially true in capital cases, wherein the attorney defending the accused has the duty to render "extraordinary efforts." ABA Standards for Criminal Justice 4-1.2(c). These efforts include the duty "to develop a plan for seeking to avoid the death penalty and to achieve the least restrictive and burdensome sentencing alternative which can reasonably be obtained." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 11.8.2 (1989). The defense attorney must "explain developments in the case to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." ABA Standards for Criminal Justice, 4-3.8(a). For these reasons, "a lawyer who abandons investigation into mitigating evidence in a capital case at the direction of his client must at least have adequately informed his client of the potential consequences of that decision and must be assured that his client has made [an] 'informed and knowing' judgment." *Silva*, 279 F.3d at 838 (citing *Jeffries v. Blodgett*, 5 F.3d 1180, 1198 (9th Cir. 1993)); *cf. Williams*, 384 F.3d at 622-23 (noting that counsel reasonably investigated potential mitigating evidence and adequately conferred with Williams regarding what penalty phase defense might be presented). Further, "a lawyer's duty to investigate is virtually absolute, regardless of a client's expressed wishes." *Silva*, 279 F.3d at 840 (citing

ABA Standards for Criminal Justice 4-4.1, cmt. at 4-5.5 (2d ed. 1980)); *see also Douglas*, 316 F.3d at 1089-90.

Under circumstances similar to the case at hand, we have concluded that the attorney's performance was constitutionally inadequate. In *Silva*, for example, the defendant had expressly instructed his attorney not to call his parents as witnesses. We concluded that this could not be construed as supporting an inference that he did not wish his family background to be investigated. *Silva*, 279 F.3d at 839. Further, in *Silva*, as in this case, the attorney did not "ma[ke] a serious attempt to educate [the defendant] about the consequences of his decision." *Id.* at 841. We held that "such conduct was objectively unreasonable under the circumstances and again amounted to deficient performance. . . ." *Id.* Further, we concluded that, even when faced with client directives limiting the scope of defense, an attorney "must conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client." *Id.* at 846 (quoting *Sanders v. Ratelle*, 21 F.3d 1446, 1456-57 (9th Cir. 1994)). "[I]f a client forecloses certain avenues of investigation, it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial." *Douglas*, 316 F.3d at 1086 (quoting *Silva*, 279 F.3d at 847). Summerlin's attorney did none of this.

The Supreme Court recently reaffirmed this duty, even when the capital defendant is "uninterested in helping" and "even actively obstructive" to developing a mitigation defense. *Rompilla*, 125 S.Ct. at 2462. Similarly, we have rejected the theory that a criminal defendant's instructions reduce an attorney's professional obligations even when the defendant attempts to curtail certain potential avenues of defense. *Douglas*, 316 F.3d at 1086; *Silva*, 279 F.3d at 838.

In the capital case context, there are additional due process concerns. A defendant's waiver must be knowing, voluntary,

and intelligent. *Whitmore v. Arkansas*, 495 U.S. 149, 165 (1990). This standard does not only mean that the defendant's waiver must be an informed decision, but also that it must be a competent one. If a client has elected to forego legal proceedings that could avert the imposition of the death penalty, then a court must make the determination "whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees v. Peyton*, 384 U.S. 312, 314 (1966). That decision must be made "in the present posture of things," *id.*, that is, a determination of capacity at the time of the decision to forego legal proceedings.

When all of these conditions have been met, we have sustained a criminal defendant's decision to limit a mitigation defense. *See, e.g., Jeffries*, 5 F.3d at 1198. When the conditions have not been satisfied, we have not. *See, e.g., Silva*, 279 F.3d at 838.[1]

[18] Applying these principles to the case at hand, we can easily determine that Summerlin's attorney's decision not to present mitigation evidence cannot be excused by his client's apparently spontaneous objection to certain testimony at the penalty phase hearing. First, as we have discussed, Summerlin's attorney did not conduct an adequate investigation. Second, he did not consult with his client at all prior to the penalty phase hearing, much less provide the advice necessary for the client to provide informed consent to forego a mitigation defense. Third, the decision regarding which witnesses were to be called rested with Summerlin's attorney, not Sum-

---

[1]We need not reach, nor do we reach, the question of whether presentation of some mitigation evidence is constitutionally required in a capital case, regardless of the client's informed decision to forego a defense. *See, e.g., People v. Deere*, 710 P.2d 925 (Cal. 1985); *State v. Hightower*, 518 A.2d 482 (N.J. Super. Ct. App. Div. 1986).

merlin. Fourth, the record does not support the conclusion that Summerlin's spontaneous reaction constituted an unequivocal direction not to conduct any penalty phase defense. Fifth, because the failure to provide a mitigation defense amounted to a concession that the death penalty should be imposed in this case, the court was obligated to make sure that this was a competent, voluntary, intelligent, informed, and knowing decision. Indeed, because the consequences were so dire—Arizona law mandated a penalty of death in this situation without the presentation of mitigating evidence—a showing that Summerlin's decision was knowing, intelligent, and voluntary was required. *Cf. Whitmore*, 495 U.S. at 164. In sum, Summerlin's spontaneous outburst cannot serve to excuse Summerlin's attorney's failure to present mitigating evidence at the penalty phase hearing.

## D

**[19]** Although we have concluded that Summerlin's attorney rendered constitutionally ineffective assistance of counsel in investigating, developing, and preparing the penalty phase presentation of this capital case, that alone is not enough to justify habeas relief. Summerlin must also show that he was prejudiced by the ineffective assistance. Under *Strickland*, this means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Here, the evidence of prejudice is more than ample.

**[20]** First, the failure to present a mitigation defense all but assured the imposition of a death sentence under Arizona law. At the time, Arizona law mandated the death penalty when the defendant had a qualifying prior conviction if there was no mitigating evidence. Ariz. Rev. Stat. § 13-703. Although Summerlin only had one prior conviction, the "road rage" aggravated felony conviction, it qualified as a "dangerous fel-

ony." Without mitigating evidence, a death sentence was virtually assured. *See Evans v. Lewis*, 855 F.2d 631, 636-37 (9th Cir. 1988) (noting that in Arizona, once an aggravating circumstance like a prior aggravated felony was found, death was inevitable without mitigating evidence, and thus holding that the failure to pursue psychiatric evidence constituted prejudicially deficient performance); *see also Smith v. Stewart*, 140 F.3d 1263, 1268, 1270 (9th Cir. 1998) (stating that in light of Arizona's statute, counsel's "few asthenic comments" at sentencing amounted to a "virtual admission that the death penalty should be imposed upon his client").

**[21]** Second, this was not by any means a clear-cut death penalty case. The initial, very experienced, prosecutor did not believe he could succeed in obtaining a death sentence given the facts and applicable law. Indeed, the prosecutor assented to an extremely favorable plea agreement. Under the proposed plea agreement, Summerlin was to enter an *Alford* plea, *see North Carolina v. Alford*, 400 U.S. 25 (1970), which enabled him, without admitting guilt, to plead guilty to second-degree murder and aggravated assault and to be sentenced accordingly. The agreement stipulated that Summerlin would be sentenced to twenty-one years in prison for the murder of Ms. Bailey, of which he would be required to serve fourteen. The agreement was subject to court approval. If the court rejected the stipulated sentence, Summerlin could either (1) allow his plea to stand and be sentenced to a term of up to thirty-eight-and-one-half years, according to the court's sole discretion, or (2) withdraw his plea of guilty and have the matters proceed to trial and disposition.

This plea agreement was withdrawn after Summerlin's initial attorney and the prosecuting attorney were replaced. However, it is indicative of the fact that this was not a clear-cut capital case.

**[22]** Third, a measure of assessing prejudice in a capital penalty phase proceeding is to "reweigh the evidence in

aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. In doing so, we must bear in mind the Supreme Court's observation in this case that Arizona law required proof of aggravating factors beyond a reasonable doubt. *Summerlin*, 124 S.Ct. at 2522 n.1 (citing *State v. Jordan*, 614 P.2d 825, 828 (Ariz. 1980)).

In this case, there were only two aggravating circumstances relied upon by the sentencing judge. The judge based his decision as to aggravating circumstances on two statutory grounds: (1) that the defendant had a prior felony conviction involving the use or threatened use of violence on another person, Ariz. Rev. Stat. § 13-703(F)(2) (1981) (later amended in 1993); and (2) that Summerlin committed the offense in an especially heinous, cruel, or depraved manner, *id.* § 13-703(F)(6). The sentencing judge found no mitigating circumstances.

Significant mitigating circumstances surrounded Summerlin's aggravated assault conviction. However, they were not presented to the sentencing judge. Summerlin did not have any other significant criminal history; this fact was also not presented at the penalty phase.

Counsel's failure to present evidence mitigating the prior conviction aggravator is particularly significant. Notably, the State's evidence in support of the only other statutory aggravating factor urged by the State—that Summerlin committed the offense "in an especially heinous, cruel, or depraved manner"—was not particularly strong. The Arizona Supreme Court has noted that these are "admittedly broad subjective terms." *State v. Vickers*, 768 P.2d 1177, 1188 n.2 (Ariz. 1989). The assessment of whether a crime is "heinous" depends on the "mental state and attitude of the perpetrator as reflected in his words and actions." *State v. Gretzler*, 659 P.2d 1, 10 (Ariz. 1983) (citations omitted). Thus, proof of premeditation is especially important in determining whether the statutory aggravator has been proven beyond a reasonable doubt.

The basis of the State's premeditation theory was not that Summerlin had planned the crime; in fact, the State never contended that he did. Rather, the State's theory was that he formed the required premeditation almost instantaneously during the commission of the crime. Although instantaneous premeditation may suffice for establishing premeditation for the underlying conviction under Arizona law, *see State v. Neal*, 692 P.2d 272, 276 (Ariz. 1984) (noting that the "length of time could have been as instantaneous as it takes to form successive thoughts in the mind"), instantaneous premeditation is not definitive for the purpose of establishing the especially heinous, cruel, or depraved aggravator. The State relied on the facts of the crime to support the especially heinous, cruel, or depraved aggravator. The strong psychiatric evidence of Summerlin's lack of impulse and emotional control and organic brain dysfunction could have provided significant mitigating evidence countering the State's circumstantial evidence that the crime was committed in an especially heinous manner. In sum, the evidence underlying the aggravating factors was not strong, particularly when measured against the requirement that aggravating factors be proven beyond a reasonable doubt.

In contrast, examining the available mitigating evidence that the Supreme Court has identified as significant, Summerlin's potential case in mitigation was strong. He had a compelling childhood history of physical and mental abuse: deserted by his father who was later killed in a police shootout; locked repeatedly in an ammonia-fumed room by his mother; and subjected to electroshock at his mother's insistence. He had learning disabilities, to the point of being considered "functionally mentally retarded." He was diagnosed as a paranoid schizophrenic and treated with anti-psychotic medications. He was also diagnosed as having an explosive personality disorder with impaired impulse control. One psychiatrist found indications of organic brain impairment, borderline personality disorder, and paranoid personality disorder. In his opinion, Summerlin "is deeply emotionally and

mentally disturbed, unaware of the motives underlying much of his behavior, and unable, because of his problems, to exercise normal restraint and control, once his highly unstable and volatile emotions are aroused." All of this was not only highly relevant as general mitigation, but was also evidence that could directly counter the other aggravating factor urged by the State, namely that the crime had been committed in a 'heinous, cruel, or depraved manner,' in the balancing of mitigating and aggravating factors by the trial court.

The State suggests that no prejudice occurred because all of the mitigating evidence was contained in Dr. Tatro's letter attached to the presentence report. However, the report cited by the State was not a psychiatric evaluation prepared for the penalty phase. It was a letter from Tatro to Summerlin's former attorney that pre-dated the initial trial. The purpose of the evaluation at that stage, and the focus of the letter, was to determine whether Summerlin was competent to stand trial and whether a potential insanity defense was available. Tatro's conclusion was that no guilt phase defense was available under the *M'Naghten* test, which had been adopted by Arizona "as the sole standard for criminal responsibility." *State v. Ramos*, 648 P.2d 119, 121 (Ariz. 1982). To sustain a defense of legal insanity under the test, "[a]n accused must have had at the time of the commission of the criminal act: (1) Such a defect of reason as not to know the nature and quality of the act, or (2) If he did know, that he did not know he was doing what was wrong." *State v. Christensen*, 628 P.2d 580, 583 (Ariz. 1981) (internal quotation marks omitted). These considerations are far different from those involved in a penalty phase mitigation defense. We have cautioned that in presenting a penalty phase mitigation defense based on mental health, counsel should not merely rely on competency evaluations conducted at the guilt phase, which are prepared for a different purpose. *Bean*, 163 F.3d at 1078-79 (concluding that defense counsel was not reasonable to rely at penalty upon mental health evidence previously amassed for competency challenge); *see also Hendricks*, 70 F.3d at 1043-44 (stating

that investigation of mental health evidence for guilt phase does not excuse failure to develop mental health mitigation evidence for penalty phase).

Dr. Tatro was a psychologist, not a psychiatrist or a neurologist. As a result, it is perhaps understandable that Dr. Tatro's letter did not discuss a key mental health defense, namely that of psychomotor epilepsy. The evidence of psychomotor epilepsy was available to Summerlin's counsel, but he did not pursue it. For example, Dr. Leonardo Garcia-Brunuel, a psychiatrist who examined Summerlin in the early stages of the case, was prepared to testify that Summerlin had a temporal lobe seizure disorder and had a psychomotor seizure when he committed the murder. Dr. Garcia testified that this may have caused uncontrollable behavior. Other psychiatrists, who were available to Summerlin's attorney at the time, testified that they had not tested Summerlin for this condition, but if the diagnosis were correct, a psychomotor seizure would have strongly affected Summerlin's ability to control his actions after the onset of the seizure. This is significant mitigation testimony that was available to Summerlin's attorney but not presented in Tatro's competency letter. Further, Dr. Tuchler, one of Summerlin's other examining physicians, conceded at the state habeas evidentiary hearing that based "on material that has been brought up subsequently," he believed that there may have been a complete loss of impulse control that affected Summerlin's ability to conform his conduct to the requirements of the law. Therefore, the notion that the Tatro letter presented a complete view of available mitigating factors is not correct.

**[23]** When considered in the aggregate, the available mitigating evidence in this case is far more compelling than the evidence the Supreme Court held adequate to establish prejudice in *Wiggins*, 539 U.S. at 534-38. As the Supreme Court noted, "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have

struck a different balance." *Id.* at 537. Although, for the purposes of resolving this issue, we evaluate prejudice in the context of judge-sentencing, the result is the same. The fact that Summerlin's counsel did not present evidence to mitigate the aggravated assault special circumstance, nor evidence to mitigate the alleged "heinous, cruel, or depraved manner" in which the crime was committed, undermines our confidence in the court's imposition of a death sentence, particularly since the State was required to prove aggravating factors beyond a reasonable doubt. For these reasons, we conclude that the failure of trial counsel to investigate, develop, and present mitigating evidence at the penalty phase hearing has undermined our confidence in the sentence of death imposed by the trial judge. Had an adequate mitigation defense been presented, there is "a reasonable probability" that an objective sentencing factfinder "would have struck a different balance." *Id.*; *see also Strickland*, 466 U.S. at 693 (noting that a reasonable probability of a different result is less than the preponderance more-likely-than-not standard); *Rompilla*, 125 S.Ct. at 2469 ("[A]lthough we suppose that [the sentencer] could have heard it all and still have decided on the death penalty, that is not the test."). We therefore hold that Summerlin has established prejudice under the standards articulated in *Strickland*. He is entitled to habeas corpus relief.

## III

**[24]** We have previously affirmed Summerlin's conviction. We reverse the district court's denial of a writ of habeas corpus as to the penalty phase and remand with instructions to grant the writ of habeas corpus as to the sentence unless the State begins resentencing proceedings within a reasonable time to be determined by the district court. Given our resolution of these issues, it is unnecessary to reach the other questions raised by Summerlin on appeal.

**REVERSED AND REMANDED.**

SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:

I concur in that portion of the court's opinion which holds that counsel's failure to investigate mitigating evidence constitutes constitutionally deficient performance. I must dissent, however, from the court's conclusion in Part II.D that the state court's affirmance of the death penalty violated constitutional standards. I agree with the district court's determination that Summerlin failed to demonstrate a reasonable probability that, but for counsel's constitutionally deficient performance, he would have received a lesser sentence. Because I would also affirm the district court on the two issues the court does not reach today, I would affirm the judgment of the district court denying the petition for writ of habeas corpus.

I must also dissent from the court's conclusion that counsel's failure to "contact or interview" the prosecution's rebuttal witnesses constitutes constitutionally deficient performance. Because this portion of the court's opinion approves the type of "per se" rule regarding attorney performance that *Strickland v. Washington*, 466 U.S. 668 (1984), precludes, I must respectfully dissent from that portion of Part II.A as well.

I

To prevail under *Strickland*, Summerlin must "affirmatively prove prejudice," which requires showing more than just the possibility that counsel's performance prejudiced the outcome. Instead, Summerlin must demonstrate "a reasonable probability" that, but for counsel's constitutionally deficient performance, he would have received a lesser sentence. *Id.* at 691, 693-94.

A

In my view, Summerlin has not met this burden. I agree with the district court that practically all the mitigating evi-

dence was in fact before the sentencing judge. The presentence report and Dr. Tatro's psychological report described Summerlin's childhood — specifically noting his alcoholic mother's proclivity to beat Summerlin so severely and consistently that he preferred juvenile detention to home — and his father's lengthy incarceration and shooting death in an armed robbery. The court cites only two new pieces of evidence regarding Summerlin's childhood: ammonia and electroshock treatments. While tragic, these additional details would not have significantly added to the sentencing judge's picture of Summerlin's childhood.

Similarly, the sentencing judge was aware of substantially all the evidence regarding Summerlin's mental difficulties. Dr. Tatro's report described Summerlin's illiteracy, dyslexia, and his symptoms consistent with paranoid personality disorder. Though the report did not mention temporal lobe seizure disorder, it explained that Summerlin had borderline personality disorder and an organic brain impairment that "may well underlie some of the difficulty he has with keeping his impulses under control."

Finally, counsel's failure to present evidence within his possession of the circumstances surrounding Summerlin's prior felony conviction is irrelevant to the question of prejudice. The court does not hold — nor can it — that this omission, unrelated to counsel's failure to investigate, was constitutional error. Even if it were, the addition of this evidence, along with the small amount of new mental health and social history evidence, would not create a "reasonable probability" that the sentencing judge would have reached a different result. The prior conviction, regardless of the circumstances surrounding it, qualified as a statutory aggravating factor under Ariz. Rev. Stat. § 13-703 at the time.

Thus, in spite of Summerlin's counsel's constitutionally deficient investigation, practically all the available mitigation evidence that counsel would have uncovered through a rea-

sonable investigation was already before the sentencing judge. In my view, therefore, Summerlin does not satisfy the second prong of the *Strickland* test. I would affirm the district court's determination that Summerlin failed to prove prejudice.

B

I would also affirm the district court's determination of two additional issues the court does not reach today because of its analysis of the prejudice issue.

As to the conflict of interest claim, I would affirm the district court's determination, for the reasons expressed in the three-judge panel opinion, that Summerlin was not prejudiced by the brief romantic encounter between the prosecutor and Summerlin's first attorney. *See Summerlin v. Stewart*, 267 F.3d 926, 930-941 (9th Cir. 2001), *withdrawn*, 281 F.3d 836 (2002). As to the state trial court's impairment, I would affirm the district court's determination, for the reasons expressed in Judge Kozinski's dissent from the three-judge panel opinion on this point, that the sentencing judge's purported marijuana addiction did not affect his performance in Summerlin's case. *Id.* at 957-964. Because the state court's affirmance of the death penalty did not violate constitutional standards, I am satisfied that the district court properly denied the petition for writ of habeas corpus.

II

I must also dissent from the portion of the court's opinion that characterizes counsel's failure to contact or to interview Dr. Bendheim and Dr. Tuchler as constitutionally deficient performance. The court cites *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), to support the proposition that counsel's decision neither to contact nor to interview the prosecution's rebuttal witnesses fell below the constitutional threshold for ineffective assistance.

With respect, *Rompilla* does not support such a view. In *Rompilla*, the Supreme Court found constitutionally deficient performance where defense counsel failed to review a prior conviction case file that represented the *core* of the prosecution's aggravation case. Defense counsel knew the prosecution planned to present details from the case file — including the rape victim's trial testimony — yet failed to review the easily available file in order to counter the prosecution's aggravation argument. *Rompilla*, 125 S.Ct. at 2464. By contrast, Summerlin's counsel, in spite of his other failings, did not fail to familiarize himself with the prosecution's aggravation evidence. The prosecution's only aggravating evidence was Summerlin's prior felony conviction. As the court notes, Summerlin's counsel knew well the details of this prosecution.

Summerlin's counsel's failure to "contact or interview" Dr. Bendheim and Dr. Tuchler — the prosecution's rebuttal witnesses — does not constitute constitutionally deficient performance. Counsel had obtained the doctors' reports that formed the basis of their testimony. He also cross examined the doctors based on the conclusions in their reports and elicited them to concede several points in Summerlin's favor. The mere fact that counsel did not take the further step of *contacting* the doctors prior to the hearing does not render his performance constitutionally deficient. There is simply no showing that counsel would have learned anything more of relevance from personal contact with these doctors than what he had learned from their reports.

The Supreme Court has repeatedly warned against the creation of "specific guidelines" or "checklist[s] for judicial evaluation of attorney performance." *Strickland*, 466 U.S. at 688; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Unfortunately, the court ignores this warning today.