# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL EMERSON CORRELL,
            *Petitioner-Appellant,*

            v.

CHARLES L. RYAN, Warden, Acting
Director, Arizona Department of
Corrections; DORA B. SCHRIRO,
Director,

            *Respondents-Appellees.*

No. 03-99006

D.C. No.
CV-87-01471-PHX-
SMM

OPINION

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, District Judge, Presiding

Argued and Submitted
September 26, 2005—San Francisco, California

Filed October 2, 2006

Before: Mary M. Schroeder, Chief Judge,
Diarmuid F. O'Scannlain and Sidney R. Thomas,
Circuit Judges.

Opinion by Judge Thomas;
Dissent by Judge O'Scannlain

17127

**COUNSEL**

Thomas Phalen and Jon M. Sands, Phoenix, Arizona, for the appellant.

James P. Beene, Kent E. Cattani, and Terry Goddard, Phoenix Arizona, for the appellee.

**OPINION**

THOMAS, Circuit Judge:

Michael Emerson Correll, an Arizona inmate sentenced to death, appeals the district court's denial of his petition for a writ of habeas corpus following our remand for an evidentiary hearing. We reverse.

I

The factual history of this case was detailed in our earlier opinion, *Correll v. Stewart*, 137 F.3d 1404, 1408-10 (9th Cir. 1998) (*"Correll I"*). Correll was convicted by an Arizona jury in 1984 of first degree murder, attempted first degree murder, kidnapping, armed robbery, and first degree burglary for his role in a triple homicide. *Id.* at 1408. He was sentenced to

death by the trial judge. *Id.* at 1410. His conviction was upheld by the Arizona Supreme Court. *State v. Correll*, 715 P.2d 721 (Ariz. 1986). However, the Supreme Court modified his death sentence as to one of the victims and invalidated one aggravating factor. *Id.* at 730-31; 734-35.

In 1987, Correll timely filed a petition for post-conviction relief pursuant to Arizona Rule of Criminal Procedure 32. In this petition, Correll asserted multiple violations of his constitutional rights, including his right to the effective assistance of counsel during the guilt and penalty phases of his trial, his right to confrontation, and his right to reliability in capital sentencing. Correll later filed five supplements to his petition, adducing evidence of his mental impairment and his attorney's ineffectiveness. The Arizona trial court summarily dismissed Correll's petition and subsequently denied Correll's motion for rehearing. The Arizona Supreme Court denied review without comment.

Correll subsequently filed a petition for writ of habeas corpus in federal district court under 28 U.S.C. § 2254. Correll alleged fifty-three constitutional violations at trial, at sentencing, and during the appellate process. The district court determined that twenty-six of Correll's claims were procedurally barred, then granted summary judgment against Correll on his remaining constitutional claims.

On appeal, we affirmed all of the district court's order except as to Correll's contention that he was entitled to an evidentiary hearing on his claim of ineffective assistance of counsel at sentencing. *Correll I*, 137 F.3d at 1420. We remanded that issue to the district court with instructions to hold an evidentiary hearing on the claim. *Id.*

On remand, the district court conducted a nine day evidentiary hearing. Applying the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny, the district court concluded that the performance of Correll's attorney at

sentencing was deficient, but that Correll had suffered no prejudice. Therefore, the district court granted judgment against Correll on his federal habeas corpus petition. This timely appeal followed.

Because Correll's petition for a writ of habeas corpus was filed before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), pre-AEDPA law governs our consideration of the merits of the claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1494 (9th Cir. 1997) (en banc). Under pre-AEDPA law, we consider a claim alleging ineffective assistance of counsel as a mixed question of law and fact that we review *de novo*. *Rios v. Rocha*, 299 F.3d 796, 799 n.4 (9th Cir. 2002). We review the district court's denial of Correll's habeas petition *de novo* and the district court's factual findings for clear error. *Id.*

## II

**[1]** As the Supreme Court has long instructed, the Sixth Amendment right to counsel in a criminal trial includes "the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). This right extends to "all critical stages of the criminal process," *Iowa v. Tovar*, 541 U.S. 77, 80-81 (2004), including capital sentencing, *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002). "Because of the potential consequences of deficient performance during capital sentencing, we must be sure not to apply a more lenient standard of performance to the sentencing phase than we apply to the guilt phase of trial." *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992).

Under the familiar *Strickland* standard, to prevail on his claim of ineffective assistance of counsel during the penalty phase of his trial, Correll must demonstrate first that the performance of his counsel fell below an objective standard of reasonableness at sentencing, and second, that "there is a rea-

sonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. Under *Strickland*, we measure an attorney's performance against an "objective standard of reasonableness," measured "under prevailing professional norms." *Id.* at 688.

There are two aspects of Correll's penalty phase defense at issue on this appeal: the investigation of possible defenses, and the presentation of the penalty phase defense.

### A

**[2]** Counsel has a duty at penalty phase "to conduct a thorough investigation of the defendant's background." *Landrigan v. Schriro*, 441 F.3d 638, 643 (9th Cir. 2006) (en banc) (citing *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). "To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.' " *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc) (quoting *Williams*, 529 U.S. at 399) (alterations in original). When it comes to the penalty phase of a capital trial, "[i]t is imperative that all relevant mitigating information be unearthed for consideration." *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999), *as amended*.

The ABA Standards for Criminal Justice provide guidance as to the obligations of criminal defense attorneys in conducting an investigation. *Rompilla v. Beard*, 545 U.S. 374, __, 125 S.Ct. 2456, 2466 (2005); *Williams*, 529 U.S. at 396. The standards in effect at the time of Correll's capital trial clearly described the criminal defense lawyer's duty to investigate, providing specifically that:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to

explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.).

It is undisputed in this case that Correll's attorney did little investigation of potential mitigating evidence for presentation at the penalty phase, although "[a]dequate consultation between attorney and client is an essential element of competent representation of a criminal defendant." *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983) (citation omitted). Correll alleges that defense counsel only met with him once, for five minutes between the trial and penalty phase. *Correll I*, 137 F.3d at 1412. Defense counsel testified at the evidentiary hearing that he met with Correll more than one time; however, it is apparent from the record that the consultation was not extensive.

**[3]** Penalty phase investigations in capital cases should include inquiries into social background and evidence of family abuse, potential mental impairment, physical health history, and history of drug and alcohol abuse. *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) (en banc). An investigation should include examination of mental and physical health records, school records, and criminal records. *Id.* "Defense counsel should also personally review all evidence that the prosecution plans to introduce in the penalty phase proceedings, including the records pertaining to criminal history and prior convictions." *Id.* (citing *Rompilla*, 125 S.Ct. at 2465).

**[4]** Although he was aware that potential mitigating evidence existed, defense counsel did not explore any avenues that might lead to development of evidence. Indeed, in light of the abundance of classic mitigation evidence of which counsel was aware, his almost complete failure to investigate is startling. His attorney knew that, among other things, Correll came from a dysfunctional family, sustained a serious head injury, was committed to various psychiatric facilities, and that he was addicted to drugs; yet defense counsel did not obtain the records nor did he interview witnesses concerning these matters. Counsel did meet with the family members who would cooperate, but he admitted that he met only once with Correll's father, sister, and brother, "around the kitchen table at the same time," and probably spent "[a] couple hours" with them. Counsel did not obtain Correll's school records, although he admitted that they may have contained mitigating evidence. He failed to obtain police reports on prior convictions and records regarding the time when Correll was in the custody of the California Youth Authority. Counsel did not obtain Correll's medical records and made no inquiry about whether an X-ray or other diagnostic test was performed to determine whether Correll suffered any brain injury following an incident in which a wall fell on Correll's head.

During the evidentiary hearing, counsel could not recall what efforts he made to gather Correll's psychiatric records, although defense counsel did remember that he did not obtain records from Correll's stays at various mental health centers.[1]

Defense counsel testified that the principal mitigation evidence he sought was information that would show Correll as a "good person" and one who had "done good deeds." But even this limited investigation was unreasonably narrow.[2] For

---

[1] As the district court found, some of these records were destroyed between the time of the trial and the time of the habeas investigation.

[2] Further, such a limitation on the scope of the mitigation investigation was unreasonable given that it was unlikely that the testimony would have

example, Reverend Curry, a chaplain with the California Youth Authority, was willing to testify on Correll's behalf and assist in anyway he could; indeed his wife told defense counsel to contact the Reverend. No contact was ever made. Yet, Curry testified that he would have testified if contacted.[3]

[5] Based on the foregoing, the district court was correct to conclude that defense counsel provided deficient representation when he failed to seek and obtain documents relating to Correll's mental health and medical conditions. Defense counsel's failure to investigate falls far short of any objectively reasonable standard against which we might measure attorney performance under the standards of the Sixth Amendment.

B

"There is no more important hearing in law or equity than the penalty phase of a capital trial." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1050 (9th Cir. 1997) (Reinhardt, J., concurring and dissenting). At the penalty phase, a capital defendant has a "constitutionally protected right [ ] to provide the jury with . . . mitigating evidence." *Williams*, 529 U.S. at 393. "Failure to present mitigating evidence at the penalty phase of a capital case constitutes ineffective assistance of counsel." *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998).

---

been sufficient to "humanize[ ] him during the time frame of the murder conspiracy at issue." *Allen v. Woodford*, 366 F.3d 823, 851 (9th Cir. 2004). Rather, the most likely type of evidence available was the type that portrays defendant as a "person whose moral sense was warped by abuse, drugs, [or] mental incapacity." *Id.*

[3]Rev. Curry was asked specifically at the evidentiary hearing "if Mr. Collins had succeeded in getting ahold of you, would you have come to testify on Mike Correll's behalf?" He responded "Yes, sir, I would have." Later in the hearing, the question was posed again, "Had you been asked by Steve Collins, you would have unhesitatingly come to help Mike at his capital sentencing, would you not?" Rev. Curry answered, "Yes, sir."

**[6]** As anemic as the defense counsel's investigation was, his presentation of mitigating evidence at the penalty phase was worse. Defense counsel put on no affirmative penalty phase defense whatsoever. He did not call a single witness to testify. He did not introduce any evidence. Rather, he elected to allow the judge to make a decision on whether to sentence Correll to death based solely on the state's evidence and the pre-sentence report.

**[7]** This was a critical error. "The failure to present mitigating evidence during the penalty phase of a capital case, where there are no tactical considerations involved, constitutes deficient performance, since competent counsel would have made an effective case for mitigation." *Smith v. Stewart*, 189 F.3d 1004, 1008-09 (9th Cir. 1999).

**[8]** The magnitude of this error becomes apparent when we consider the effect of the error under Arizona law. At the time of the penalty phase proceedings, Arizona law mandated the death penalty when the defendant had a qualifying prior conviction if there was no mitigating evidence. Ariz. Rev. Stat. § 13-703 (1984). One of the aggravating circumstances found by the sentencing judge was a previous violent felony. *State v. Correll*, 715 P.2d at 731. Thus, the failure to present any evidence in mitigation "all but assured the imposition of a death sentence under Arizona law." *Summerlin*, 427 F.3d at 640; *see also Evans v. Lewis*, 855 F.2d 631, 637 (9th Cir. 1988) (noting that in Arizona, once an aggravating circumstance like a prior aggravated felony was found, death was inevitable without mitigating evidence, and thus holding that the failure to pursue psychiatric evidence constituted prejudicially deficient performance).

In this case, the State argued five aggravating factors. Correll's defense counsel disputed only a few of them. He disputed that the crimes were cruel, heinous, and depraved, and he argued that convictions for more than one homicide could not be used as an aggravating factor because the statute autho-

rizing this factor was not in effect on the offense date. At the evidentiary hearing in this case, he conceded that he thought "it was a veritable certainty" that the court would find "at least two, and probably all five of [the] aggravating factors." The court found four aggravating factors.

Defense counsel's entire mitigation argument was contained in less than one page of a sentencing memorandum, which is reproduced *in toto* here:

A.  Defendant was under the influence of alcohol and drugs at the time the offenses were committed. Guy Snelling stated in an interview with police officers on April 12, that there was alcohol on the breath of Defendant at the time the offenses were committed. It is obvious from this and the conduct of the perpetrators, that they were under the influence of alcohol or drugs or both at the time the offenses were committed.

B.  Defendant was only a follower in the commission of the crimes. Guy Snelling stated in an interview with defense counsel on August 14, 1984, that it was clear that John Nabors was the leader of the two perpetrators and was making the decisions. This is further corroborated by the fact that it was John Nabors who knew Guy Snelling would have illicit drugs and money and therefore, John Nabors must have done the planning of the robbery.

C.  Prior to the robbery, there was no reason to believe that anyone would be present other than Guy Snelling, and therefore, there was no prior plan to kill Debra Rosen, Robin Cady or Shawn D'Brito.

    D.   Defendant has cooperated with the Adult Proba-
        tion Office in the preparation of his presentence
        report.

    E.    Defendant's age.

That, in total, was defense counsel's mitigation case. When asked at the evidentiary hearing "what was your sentencing strategy," trial counsel responded that it was basically, "hoping that Judge Howe liked Mr. Correll," that "it was a drug ripoff that went bad and that Michael was under the influence," and that "he wasn't the leader in the crimes."

Defense counsel did not put on any witnesses or evidence to support his mitigation case.[4] His sentencing memo does not even attempt to rebut three of the five aggravating factors urged by the State. In his oral presentation at sentencing, counsel mentioned the aggravating factors, but in form only, without any substantial legal position or evidentiary support. The entirety of his oral argument at the penalty phase consists of approximately 7 pages of transcript. The state trial court record states that "Defendant waives presentation of mitigating evidence."

[9] Given his virtual concession of most of the aggravating factors argued by the State, and waiver of the presentation of mitigation evidence, the outcome was obvious: imposition of the death penalty. The Arizona Supreme Court, in re-weighing the aggravating and mitigating factors, found no mitigating factors "sufficiently substantial to call for leniency." *State v. Correll*, 715 P.2d at 735. The Court highlighted

---

[4]As opposed to the dissent's characterization of counsel "repeatedly dr[awing] the sentencing judge's attention" to the likelihood that Correll was under the influence of drugs and alcohol at the time of the crime, there is but a single mention of drugs and alcohol in the brief sentencing memorandum and a single reiteration of that point at the sentencing hearing.

the lack of evidence presented in mitigation and noted that the "defendant has offered no evidence or expert testimony on which we could base a finding that he was unable to appreciate the wrongfulness of his conduct." *Id.* The Court was particularly dismissive of his attempt to count cooperation in the pre-sentence investigation as a mitigating factor, noting "[i]t is in defendant's interest to cooperate at sentencing; defendant should not be rewarded for self-serving acts." *Id.*

As Correll demonstrated at his evidentiary hearing, there was a substantial amount of mitigation evidence available for presentation at the penalty phase. Correll had endured an abusive childhood. His mother was a Jehovah's Witness, whose commitment to her church came before her commitment to her family. She spent most of her time with the church, often neglecting her six children's basic needs. The children were required to attend adult bible study class with her three nights a week, for three hours per night. If they misbehaved or indicated that they were confused or did not understand the religious doctrine, they were punished. Correll's father was largely absent but sometimes aided his wife in physically punishing their children. There was evidence of incest in the family.

When Correl was seven, a brick wall collapsed on his head. Although he was unconscious for some time after the accident, his parents did not seek medical treatment until several days later when he was still not back to normal. Several experts testified that this type of accident and the symptoms Correll exhibited then and now indicate a high likelihood of brain impairment.

Against this backdrop, Correll began experimenting with alcohol and drugs around age ten. He was using marijuana, LSD, and amphetamines regularly by age twelve, behavior that can be characterized as self-medication for the everyday trauma of his life, and the mental health diagnoses he later received when he became a ward of the state.

It is notable that each of the six Correll children report that they had or have had substance abuse problems beginning in childhood or adolescence. Further, at least five of the six children spent time in juvenile correctional facilities, and all four of the boys in the family have spent time in adult correctional facilities.

In response to Correll's obvious substance abuse problems, his parents intervened with beatings and threats of kicking him out of the house. Further, the state failed to recommend drug or alcohol treatment despite Correll's frequent contact with the juvenile authorities.

After Correll was shot in the arm at age 14, the hospital asked his parents to let him come home. They allowed him to recuperate at home for three or four days before asking the state to sever their parental rights. At that time, they cut off all communication with their son and considered him dead as required by their church's teachings.

Correll became a ward of the state at age 14 and spent his teenage years in various state institutions described as "gladiator schools," which were characterized as cruel and inhumane, even by those who worked there. He was placed in programs for low-performing students, which were referenced as "dummy shacks." Within months of becoming a ward of the state, 14 year-old Correll became addicted to heroin.

Correll was committed to psychiatric institutions at least twice during his teen years and was described at age 16 as "severely psychologically impaired." He was treated with a tranquilizer/anti-psychotic drug while institutionalized, and attempted suicide on two occasions. However, there is no evidence that Correll continued to receive treatment after these stays.

Methamphetamine eventually became Correll's drug of choice, which he used whenever he could. Correll offered

expert testimony during the evidentiary hearing of the effect of high methamphetamine use, including brain damage, blackouts, and methamphetamine-induced psychosis, all of which may be compounded by sleep deprivation.

At the time of the murders, Correll was injecting a quarter gram to a gram of methamphetamine in one shot, and injecting three to four shots a day. According to expert testimony at the evidentiary hearing, Correll was in the top 1% of methamphetamine users in terms of quantity. During the period of time in which the crimes were committed, Correll's typical pattern was to go seven to ten days without sleep, followed by one to two days of continuous sleep. He was observed injecting methamphetamine shortly before the crimes were committed. Expert testimony indicated that he was likely having impulse control problems, judgment impairment, and aggressiveness at the time of the crime, and may have been experiencing drug-induced paranoia.

[10] In sum, there was a substantial amount of mitigating evidence available[5] that is clearly sufficient to establish prejudice under the Supreme Court's standard in *Wiggins*, 539 U.S. at 534-38. Counsel's failure to present a mitigation case constitutes constitutionally ineffective assistance of counsel.

C

The State contends that the failure to put on penalty phase evidence was a strategic choice, protected under *Strickland*. To be sure, under *Strickland*, we must defer to trial counsel's strategic decisions. "A reasonable tactical choice based on an

---

[5]The government argues that much of this evidence was already before the sentencing court in the pre-sentence report. While the bare facts of Correll's troubled past were indeed presented to the court, without further investigation and presentation of contextual evidence and argument, such facts served only to demonize Correll rather than to mitigate the appropriateness of imposing the death penalty for his actions.

adequate inquiry is immune from attack under *Strickland*." *Gerlaugh*, 129 F.3d at 1033. However, to be considered a constitutionally adequate strategic choice, the decision must have been made after counsel has conducted "reasonable investigations or [made] a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. In addition, "[e]ven if [a] decision could be considered one of strategy, that does not render it immune from attack— it must be a *reasonable* strategy." *Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir. 1997) (emphasis in original). Defense counsel both failed to investigate potential mitigation evidence sufficiently to make an informed strategic decision and, when considered objectively, his strategy cannot be considered reasonable.

1

**[11]** A decision by counsel not to present mitigating evidence cannot be excused as a strategic decision unless it is supported by reasonable investigations. *See Williams*, 529 U.S. at 394 (recognizing a constitutional right to present mitigating evidence to the jury); *Silva*, 279 F.3d at 843 (recognizing "the breadth of a criminal defendant's constitutional protection against his attorney's failure to investigate mitigating evidence when defending his client against a capital sentence"). In *Wiggins*, the Supreme Court held that the traditional deference owed to the strategic judgments of counsel is not justified where there was not an adequate investigation "supporting those judgments." 539 U.S. at 521.

Here, as we have discussed, defense counsel failed to make a reasonable investigation into potential mitigating evidence. Therefore, his decision not to put on a mitigation case cannot be considered to be the product of a strategic choice. An uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all. *Cf. Strickland*, 466 U.S. at 690-91 (holding that "strategic choices made after less than complete investigation

are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").

In *Silva*, for example, we held that in the absence of diligent investigation, counsel cannot make a reasoned tactical decision regarding whether or not to present mitigating evidence. 279 F.3d 846-47. Indeed, we determined that even if a client forecloses certain types of mitigation evidence, "it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of [mitigating evidence]." *Id.*

**[12]** Here, an abundance of classic mitigation evidence existed. However, counsel failed to investigate these potential avenues, and was therefore unable to make an informed decision as to whether to present the evidence. His choice not to present mitigation evidence, therefore, cannot be justified as strategic.

2

To the extent there was any strategy involved in the penalty phase presentation, it cannot be considered a reasonable strategy by any objective measure.

Defense counsel chose to rely on the pre-sentence report prepared by a state probation officer, despite characterizing it as "one-sided." During his short sentencing argument, defense counsel criticized the author of the pre-sentence report for not talking to several people who could have provided mitigating statements. The irony, of course, is that defense counsel could have put into evidence during the penalty phase the very mitigating evidence that he felt was important for the probation officer to hear.

The report described the crimes as "particularly heinous" and speculated that "the murder scene in the desert must have been particularly gruesome." The probation officer concluded

that, given the circumstances of the crime, "[t]hey obviously planned the murders ahead of time and then calculatingly and unemotionally carried out their plans." The pre-sentence report described Correll's history as "a text book of psychopathology," and "riddled with instances of violent behavior and armed aggression." The probation officer determined that Correll "was not capable of functioning in society." The report concluded with the observation that "[h]e is a threat, a menace, and in my opinion, the community at large should never again be subjected to the risk of recurrence of this type of behavior." These statements are hardly the words of mitigation, and no competent capital defense counsel would have relied upon the report as providing mitigation evidence, much less the sole source of mitigation evidence.

[13] Defense counsel testified at the evidentiary hearing that he "was basically hoping [the judge] would think it was a one-time incident and want to give Mr. Correll a break and find a mitigating factor." However, the pre-sentence report contained explicit references to an extensive criminal history that belied this theory. Indeed, the page and a half of criminal convictions reported is longer than defense counsel's entire mitigation presentation in his sentencing memorandum. It was not a reasonable strategy to rely on the pre-sentence report to prove that the crime was a "one-time incident," when the entire report drew the opposite conclusion. Further, when examined at the evidentiary hearing, defense counsel was forced to admit that portraying the crime as a one-time drug ripoff gone bad was not something that would constitute a mitigating factor.

During the evidentiary hearing, defense counsel revealed a fundamental misconception of mitigation evidence. He referred to the sentencing hearing as "a dog and pony show" and "so much smoke." He said he felt that the judge would not have been receptive to mitigation evidence that was "touchy-feelly [sic] fuzzy-headed kind of stuff." When asked about the classic mitigation evidence, such as potential brain

injury,[6] a history of drug addiction, and abuse suffered as a child, he testified that he didn't think of the evidence as favorable evidence. However, it is precisely this type of evidence that the Supreme Court has termed as "powerful." *Wiggins*, 539 U.S. at 534.

It appears clear from examination of his testimony that defense counsel was afraid of the sentencing judge. In fact, he forewent psychological testing because he felt that the judge would learn of it, and testified that he might have presented evidence of Correll's history of drug addiction had he been before a different judge.[7] He believed that the judge would use mitigating evidence as an aggravating factor, in violation of the mandatory language of Ariz. Rev. Stat. § 13-703(E). However, this presumes that the judge would not follow the law—speculation that is not supported by the record.

Fear of a particular sentencing judge's reaction also ignores the fact that, in capital cases, the Arizona Supreme Court con-

---

[6]As the district court noted, the Arizona Courts place significant weight on brain injuries as mitigating evidence. Similarly, "[w]e have repeatedly held that counsel may render ineffective assistance if he is on notice that his client may be mentally impaired, yet fails to investigate his client's mental condition as a mitigating factor in a penalty phase hearing." *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002) (internal quotations omitted).

[7]The dissent characterizes this decision not to present psychological evidence as strategic because it would "make it easier for the judge to sentence Correll to death because it would cause him to view Correll as permanently damaged psychologically." However, counsel's failure to investigate Correll's psychological history for fear of the trial judge cannot be termed "strategic." Counsel worried that the trial judge would presume that any psychological evaluation portrayed Correll in a negative light if he granted a contact visit order for such an evaluation and the results were never submitted to the court. This fear presumes that the trial judge would act inappropriately by considering evidence outside of the record in making his sentencing decision and fails to recognize the importance of creating a record for review, even if the trial judge likely would be unsympathetic. Psychological injury is the type of evidence the Supreme Court has viewed as classic mitigating evidence. *Wiggins*, 539 U.S. at 534.

ducts an independent review of the aggravating and mitigating factors and re-weighs them. *See State v. Johnson*, 710 P.2d 1050, 1055 (Ariz. 1985) ("Whenever the trial court imposes the death sentence we must conduct an independent review of the facts that established the aggravating and mitigating circumstances in order to determine for ourselves if the latter outweigh the former and justify the sentence."); *see also State v. Richmond*, 560 P.2d 41, 51 (Ariz. 1976) ("[T]he gravity of the death penalty requires that we painstakingly examine the record to determine whether it has been erroneously imposed."). The Arizona Supreme Court also conducts a proportionality review. *State v. Correll*, 715 P.2d at 737-38. Therefore, even if defense counsel's fears about the judge were legitimate, there is no strategic excuse for failing to put on evidence in support of statutory mitigating factors that the Arizona Supreme Court could have considered in its independent re-weighing of aggravating and mitigating factors.

[14] In short, to the extent that defense counsel had a strategy at all, it cannot be considered an objectively reasonable strategy.

3

Counsel's ineffective assistance at sentencing cannot be excused as strategic. He failed to conduct a sufficient investigation to be able to make an informed judgment. To the extent his decisions reflected any tactical considerations, his approach of not putting on a mitigation case cannot be considered an objectively reasonable strategy, even when viewed under the highly deferential *Strickland* standard.

III

[15] It is not enough for Correll to establish that his counsel's performance at sentencing fell below an objective standard of reasonableness at sentencing. He must also "show that there is a reasonable probability that, but for counsel's unpro-

fessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to "undermine confidence in the outcome." *Id.*

In considering this question, we have recognized that deficient performance and prejudice questions may be closely related. *See Summerlin,* 427 F.3d at 643 ("[W]e conclude that the failure of trial counsel to investigate, develop, and present mitigating evidence at the penalty phase hearing has undermined our confidence in the sentence of death imposed by the trial judge."); *Smith*, 189 F.3d at 1011 ("Because of [counsel's] failure to provide competent representation, our confidence in the outcome of Smith's sentencing has been undermined."). In establishing prejudice under *Strickland*, it is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances. *Williams*, 529 U.S. at 398. Accordingly, even where the facts discovered on habeas review do not rise to the level of statutory mitigation, we have held that a reasonable probability existed that this information could have affected the sentence. *Smith*, 140 F.3d at 1270; *see also Rompilla*, 125 S. Ct. at 2469 ("although we suppose that [the sentencer] could have heard it all and still have decided on the death penalty, that is not the test").

**[16]** Here, as we have discussed, there was a substantial amount of mitigating evidence that could have been presented, but was not. As the Supreme Court noted, "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. The failure to present mitigating evidence was particularly damaging under Arizona law that existed at the time, which virtually guaranteed the imposition of the death penalty based on Correll's prior qualifying conviction.

The dissent argues that Correll was not prejudiced by the failure to investigate and present mitigation evidence and argument, because the presentation of such evidence and argument "would have enabled the prosecution to present very damaging rebuttal evidence." However, a significant portion of that damaging rebuttal evidence was already available through the pre-sentence report. These facts could provide the basis for either the dehumanization of Correll, or mitigation provided the proper context.[8]

[17] Correll was constitutionally entitled to the presentation of a mitigation defense. He did not receive one, although substantial mitigation evidence existed. Most importantly, because Arizona law required the imposition of a death sentence if aggravating factors were proven and no mitigating factors presented, the failure to present any mitigation defense constituted ineffective assistance of counsel under the standards set forth in *Strickland*. The fear of a trial judge cannot be considered strategic justification for forgoing the presentation of a mitigation defense, particularly given that (1) Arizona law required imposition of the death penalty when no mitigating factors were found, and (1) the Arizona Supreme Court was required to re-weigh the aggravating and mitigating factors.

[18] We conclude that Correll is entitled to relief in the form of a new penalty phase trial. We reverse the judgment of the district court and remand with instructions to issue a writ of habeas corpus.

**REVERSED.**

---

[8]That some of the defense witnesses at sentencing might have presented inculpatory testimony is not particularly significant, given that counsel had abandoned at sentencing any claims of actual innocence or misidentification.

O'SCANNLAIN, Circuit Judge, dissenting:

I respectfully dissent from the court's conclusion that Correll has met the "highly demanding and heavy burden of establishing actual prejudice" in the pursuit of his claim of ineffective assistance of counsel during the penalty phase of the trial. *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (internal quotation marks omitted). The majority ignores the mountain of precedent which provides that, in assessing prejudice, we must consider not only the likely benefits of the mitigating evidence counsel failed to present, but also its likely drawbacks. The majority also substitutes its independent analysis of the record for that of the district court, and relies on its own view of the evidence rather than considering, as we must, the effect the evidence would have had on an Arizona sentencing judge twenty-two years ago. Because I do not believe that Correll has met his burden "affirmatively [to] prove prejudice," I would affirm the judgment of the district court denying the petition for writ of habeas corpus. *See Strickland v. Washington*, 466 U.S. 668, 693 (1984).

I

The facts of Correll's brutal crimes are disturbing, but must be recounted to illustrate the unlikelihood that Correll's new evidence would have convinced the sentencing judge not to impose the death penalty.[1]

A

On the night of April 11, 1984, as Guy Snelling and his girlfriend Debra Rosen were getting ready to go to sleep, a

---

[1]Although it is normally not necessary to restate the facts and procedural history in a dissenting opinion, the reader will understand that this exercise is necessary due to the sharp divergence between the majority's presentation of the facts and the district court's factual findings.

knock came at the door. Snelling answered the door and found John Nabors, his co-worker, and Correll, whom he had not met.

After Snelling let the two men into his home, Nabors pulled a gun and demanded money. Correll secured Snelling and Rosen with duct tape. When Robin Cady and Shawn D'Brito, two friends of Snelling, unwittingly arrived at the house, Correll secured them with duct tape as well. Then Correll and Nabors escorted Snelling throughout his home to search for money and valuables.

After raiding the house for approximately 45 minutes, Nabors and Correll exited with Cady, D'Brito, and Snelling, whom they forced into Cady's car. Nabors briefly went back inside to secure Rosen. While holding the gun on the three victims, Correll drove to a deserted area where Nabors's truck was parked. Nabors took his truck and followed Correll, who was still driving Cady's car with the three victims, to a desert area north of Phoenix. There, they forced the three victims out of the car and made them lie face down on the ground. Correll shot Snelling in the back of the head. Nabors then shot and killed D'Brito, and then tried to shoot Cady. The gun misfired a couple of times and Correll said "hurry up, hurry up, . . . okay, it's cool, no cars coming, get a shell chambered." After reloading the gun, Nabors was finally successful in shooting and killing Cady. After Correll and Nabors left, Snelling, who miraculously did not die, reported the crime. Rosen, whom Nabors and Correll had left in the house when they drove the other three victims into the desert, was later found in the house, killed by strangulation.

B

At trial, Correll's sole defense was misidentification—namely, that Snelling, who was under the influence of drugs and alcohol when the crimes occurred, had wrongly identified Correll as one of his assailants, and that it was reasonably

likely that Correll's brother Terry, who resembled Correll, had committed the crimes in Correll's stead. Unpersuaded by this defense, a jury convicted Correll of three counts of first degree murder, one count of attempted first degree murder, one count of armed robbery, one count of first degree burglary, and four counts of kidnaping.

At sentencing, the government urged the court to impose the death penalty. The government asserted that five statutory aggravating factors were present: (1) a previous violent felony conviction;[2] (2) grave risk of death to others in addition to the persons murdered;[3] (3) commission of the murders in anticipation of pecuniary gain;[4] (4) commission of the murders in an especially heinous, cruel or depraved manner;[5] and (5) convictions for multiple murders during the offense.[6]

In response, Correll's attorney argued that the prosecution had failed to prove, as required by *Enmund v. Florida*, 458 U.S. 782 (1982), that Correll intended to kill Rosen, Cady, and D'Brito. Although the sentencing court did not accept this argument, Correll's attorney preserved it for appeal and the Arizona Supreme Court later modified one of Correll's death sentences to life imprisonment on this ground. *See State v. Correll*, 715 P.2d 721, 730-31 (Ariz. 1986). Correll's attorney also countered each of the government's proffered aggravating factors.[7] He argued—and the sentencing court agreed—

---

[2]Ariz. Rev. Stat. § 13-703(F)(2).

[3]Ariz. Rev. Stat. § 13-703(F)(3).

[4]Ariz. Rev. Stat. § 13-703(F)(5).

[5]Ariz. Rev. Stat. § 13-703(F)(6).

[6]Ariz. Rev. Stat. § 13-703(F)(8).

[7]The majority unduly discounts defense counsel's attack of the government's asserted aggravating factors. *See* Maj. Op. at 17140-41. Both the Arizona Supreme Court and the state trial court disagreed with the majority's assessment of counsel's performance with respect to the "grave risk of death to others" and the "multiple murders" aggravating factors, agreeing with counsel's assertion that the first factor was unsupported and the

that the "grave risk of death to others" aggravating factor did not apply. He also argued that the multiple murder aggravating factor could not be considered. Although the sentencing court did not accept this argument, Correll's attorney preserved it for appeal and the Arizona Supreme Court later invalidated this aggravating factor. *See id*. at 734-35. Correll's attorney unsuccessfully argued that the evidence did not support the remaining aggravating factors.

In addition to challenging the government's aggravating factors, Correll's attorney also pointed to mitigating evidence.[8] In particular, he emphasized that Correll was not the trigger man as to the three people who died and that "John Nabors was the leader." He noted that "Mr. Nabors was the one that knew Guy Snelling was a drug dealer, that Guy Snelling would have money and drugs [when] the robbery occurred. So, it's obvious that John Nabors did plan the robbery." He drew the court's attention to Snelling's statement that "it appeared to him that John Nabors was the leader, was the one calling the shots, so to speak." He further noted that, prior to the robbery, Correll could not have reasonably anticipated that anyone would be present in the home other than Guy Snelling. Accordingly, he could not have planned the three deaths.[9]

---

second was unconstitutional in this case. The Arizona Supreme Court also found persuasive defense counsel's argument that the government failed to prove beyond a reasonable doubt that Correll intended to kill one victim and therefore the death penalty could not be imposed on that count. Furthermore, counsel made compelling substantive legal and factual arguments with respect to the other aggravating factors.

[8]Quoting the state trial court record, the majority asserts that the "Defendant waive[d] presentation of mitigating evidence." Maj. Op. at 17140; *see also id.* at 17140. This excerpt, however, was only the conclusion of the court clerk. Indeed, defense counsel adamantly stated that "[w]e didn't waive" the presentation of mitigating evidence.

[9]A defendant's inability reasonably to foresee that his conduct would cause death to another person is a statutory mitigating factor. *See* Ariz. Rev. Stat. § 13-703(G)(4).

Correll's attorney also argued in both his sentencing memorandum and his oral argument that Correll was under the influence of drugs and alcohol at the time of the murders.[10] He specifically drew the sentencing judge's attention to Snelling's statement to the police that he smelled alcohol on Correll's breath during the crimes. Correll's attorney further argued that "the reason that Mike [Correll] has had problems is the fact that when he was 14 years old, that both of his parents abandoned him and what can be expected when someone is abandoned by their parents at such an early age?" Correll's attorney also argued that Correll's age—24—was mitigating.[11]

Although counsel knew that Correll had received psychological counseling, counsel declined to develop psychological evidence because he believed, based on his conversations with Correll, that the only possible diagnosis was antisocial personality disorder. As counsel explained at the evidentiary hearing, he believed that this diagnosis would carry little mitigating weight with the sentencing judge and would, in fact, make it easier for the judge to sentence Correll to death because it would cause him to view Correll as permanently damaged psychologically.[12]

---

[10]A defendant's inability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law is a statutory mitigating factor. *See* Ariz. Rev. Stat. § 13-703(G)(1).

[11]A defendant's age is a statutory mitigating factor. *See* Ariz. Rev. Stat. § 13-703(G)(5).

[12]The district court explained, based on the evidence presented at the sentencing hearing:

> Rather than argue Petitioner's personality disorder to Judge Howe, [counsel] decided that Petitioner had a better chance to avoid the death penalty if he portrayed that Petitioner was involved in a drug ripoff which had gone terribly wrong, that Petitioner had only been a follower in the matter, that he had not been the trigger-man as to the three people who died, that Guy Snelling had reported to police that Petitioner was under the influence of drugs and/or alcohol at the time of the crimes, and that he should be shown sympathy because his family abandoned him at the age of 14.

### C

The sentencing judge ultimately found four statutory aggravating circumstances.[13] Determining that the mitigating evidence did not outweigh these factors, the judge sentenced Correll to death on each of the murder counts.[14] The Arizona Supreme Court affirmed Correll's convictions, with the modifications previously mentioned. It then re-weighed the aggravating and mitigating factors and determined that the death penalty was appropriate. *Correll*, 715 P.2d at 736.

In his state petition for postconviction relief, Correll alleged that his counsel rendered ineffective assistance at sentencing. He contended that during the month that elapsed between the jury verdict and the sentencing hearing, his attorney met with him for just five minutes. He also contended that his attorney failed to investigate and to develop available evidence relating to his psychiatric history and condition at the time of the crimes. The state trial court summarily dismissed the petition, stating that

> [n]o colorable issues relating to ineffective assistance of counsel are raised. In this respect, the Court specifically recalls that the trial work of defense counsel was precise, careful, and competent, and manifested strategic and tactical judgments of the same high quality.

---

[13]The Supreme Court has since held that Arizona's practice of judges finding aggravating factors violates the Sixth Amendment right to a jury. *See Ring v. Arizona*, 536 U.S. 584 (2002). *Ring* does not apply, however, to cases such as this one that were already final on direct review. *See Schriro v. Summerlin,* 542 U.S. 348, 358 (2004).

[14]The majority erroneously states that "Arizona law required imposition of the death penalty when no mitigating factors were found." Maj. Op. at 17150. But, as the majority itself recognizes in the preceding sentence, Arizona law only required the imposition of the death penalty if aggravating factors were proven *and* no mitigating factors sufficiently substantial to call for leniency were found.

The Arizona Supreme Court denied review without comment.

Correll later filed a federal petition for writ of habeas cor-
pus and the district court entered summary judgment against
him. On appeal ("*Correll I*"), we held that Correll's ineffec-
tive assistance allegations, which had not been fully explored
in state court, entitled him an evidentiary hearing. We held
that Correll had established (1) that the state court trier of fact
had not conducted a full and fair hearing to find the relevant
facts, and (2) that his allegations, if proven, might constitute
a colorable ineffective assistance claim. *Correll v. Stewart*,
137 F.3d 1404, 1411-12 (9th Cir. 1998).

## D

Pursuant to our instructions on remand, the district court
conducted a nine-day evidentiary hearing on Correll's ineffec-
tive assistance of counsel claim. Correll, who waived his
appearance, called fourteen witnesses. The government called
three witnesses. The district court studied reams of docu-
ments, including Correll's attorney's notes, which were nearly
a quarter-century old, and Correll's childhood medical
records, which were two decades older.

Based on the evidence presented at the hearing, the district
court rejected Correll's allegation that his attorney only spent
five minutes with him between conviction and sentence. The
district court found instead that "[p]rior to sentencing, [coun-
sel] had multiple face-to-face meetings and phone calls with
Petitioner" in which he "discuss[ed] with Petitioner the over-
all mitigation case and the specific reasons he would present
to the court in favor of a life sentence rather than the death
penalty." The district court found that counsel spoke to
between 40 and 50 witnesses, including all of Correll's family
members who would cooperate. The district court further
found that, unfortunately, "[t]he witnesses were not able to
provide relevant useful mitigation information. In fact, in

many instances, the witnesses only provided inculpatory and non-mitigating information."

After outlining all the evidence in a detailed 109-page disposition, the district court found constitutionally deficient performance on two narrow grounds: (1) counsel's failure to obtain medical treatment records arising out of a head injury that occurred when Correll was seven years old and (2) counsel's failure to thoroughly review Correll's mental health records. The court determined that a reasonable attorney would have investigated these matters for possible mitigating evidence rather than relying on his own impression, based on his interaction with the defendant, that the defendant had no intellectual or psychological deficits that could serve as mitigating evidence.

Notwithstanding these errors, the district court found that Correll was not prejudiced by counsel's ineffectiveness. After postconviction counsel developed all the evidence relating to Correll's head injury and mental health history, it was clear that there was "a lack of substantial mitigation" available because Correll, in the words of the district court, "is a highly functioning adult" who has never suffered from brain damage or a major psychological disorder. Furthermore, the district court found that much of the evidence Correll now claims counsel should have put before the sentencing judge would have been counterproductive because, in the words of the district court, it would have "opened the door for the prosecution to come forward with strong damaging rebuttal information to counter its mitigating effect."

II

As the Supreme Court has made clear, we do not presume prejudice from counsel's ineffective assistance. *Strickland*, 466 U.S. at 693. Once we determine that "counsel's performance was deficient, [Correll] still bears the *highly demanding and heavy burden* of establishing actual prejudice." *Allen*,

395 F.3d at 1000 (internal quotation marks omitted) (emphasis added). This burden "affirmatively [to] prove prejudice" requires showing more than just the possibility that counsel's performance prejudiced the outcome. *Strickland*, 466 U.S. at 693. Correll must demonstrate "a reasonable probability" that, but for counsel's constitutionally deficient performance, he would have received a lesser sentence. *Id.* at 695. In assessing prejudice, of course, "we are not asked to imagine what the effect of certain testimony would have been upon us personally." *Stewart v. Smith*, 140 F.3d 1263, 1270 (9th Cir. 1998). We instead must determine what the effect of Correll's new evidence might have been upon the Arizona sentencing judge at the time of Correll's sentencing hearing twenty-two years ago.[15] *Id.*

The majority, in reaching its conclusion that Correll has met his heavy burden to demonstrate prejudice, ignores the mountain of precedent which provides that we must consider not only the benefits of the ostensibly mitigating evidence counsel failed to present, but also its drawbacks. The Supreme Court has long instructed that we must consider whether the new mitigating evidence, if presented, would have been counterproductive. In *Darden v. Wainwright*, 477 U.S. 168, 186 (1986), the Supreme Court held that trial counsel's failure to present any mitigating evidence did not constitute deficient performance because the presentation of such evidence would open the door to damaging rebuttal evidence. Similarly, in *Burger v. Kemp*, 483 U.S. 776 (1987), the Supreme Court held that psychological records were "by no means uniformly helpful to petitioner because they suggest violent tendencies that are at odds with the defense's strategy of portraying petitioner's actions on the night of the murder as the result of [another person's] strong influence upon his will." *Id.* at 793.

---

[15]Because Correll's petition for a writ of habeas corpus was filed before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, pre-AEDPA law governs our review. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997).

Based on these cases, we have held that an attorney who failed to present psychological testimony relating to the defendant's antisocial personality disorder was not ineffective because such testimony "would have allowed the prosecution during cross-examination and rebuttal to rehash the horrific details of [the] crimes." *Bonin v. Calderon*, 59 F.3d 815, 836 (9th Cir. 1995). The Supreme Court, in *Wiggins v. Smith*, 539 U.S. 510 (2003), repeatedly emphasized that this line of cases remains in effect. In finding that Wiggins had met his burden to prove prejudice, the Supreme Court noted "Wiggins d[id] not have a record of violent conduct that could have been introduced by the State to offset" the mitigating evidence. *Id.* at 537. The Court explained that "Wiggins's history contained little of the double edge" present in other cases. *Id.* at 535. It also noted that there was no evidence "suggest[ing] that a mitigation case, in its own right, would have been counterproductive." *Id.* at 525. The majority errs by ignoring the fact that, unlike *Wiggins*, much of new mitigating evidence Correll argues his attorney should have presented would have enabled the prosecution to present very damaging rebuttal evidence.

The majority compounds this error by substituting its own independent review of the record for that of the district court. Our review of the district court's factual findings is supposed to be "significantly deferential, in that we must accept the district court's factual findings absent a definite and firm conviction that a mistake has been committed." *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (internal quotation marks omitted). As long as the district court's account of the evidence " 'is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.' " *Phoenix Engineering and Supply Inc. v. Universal Elec. Co., Inc.*, 104 F.3d 1137, 1141 (9th Cir. 1997) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985)). Unfortunately, the majority repeatedly flouts this standard of review. As set out below,

these errors lead the majority to eviscerate the prejudice standard set out in *Wiggins*, 539 U.S. 510.

Taking the facts as they actually are, not as the majority wishes them to be, it is apparent that Correll failed to carry his burden to demonstrate "a reasonable probability" that, but for counsel's constitutionally deficient performance, he would have received a lesser sentence. *Strickland*, 466 U.S. at 695.

A

First, counsel's failure to obtain the medical records relating to Correll's childhood head injury had virtually no impact on sentencing because these records did not, in fact, demonstrate any brain damage. Based on testimony received from neuropsychologists, the district court found that Correll "did not suffer any brain injury from the block wall that fell on him when he was 7 years old." The district court credited a neuropsychologist's testimony "that of all the capital defendants he has tested, Petitioner is one of the highest functioning" and determined that Correll is "a highly functioning adult."

The medical records from the incident support the district court's assessment. After the childhood injury, Correll was diagnosed with a subgaleal hematoma, which is a bruise or collection of blood under the scalp, but above the skull. The hematoma cleared in five days, at which time a doctor described the seven-year-old Correll as alert and well. *See Smith v. Stewart*, 189 F.3d 1004, 1013 n.4 (9th Cir. 1999) (noting that "the absence of [a presentation of] mitigating evidence may be irrelevant when no substantial mitigating evidence is available"). I accordingly cannot agree with the majority's conclusion that Correll has carried his burden to establish a reasonable possibility that he would have received a lesser sentence if the records relating to his childhood head injury had been before the sentencing judge.

B

Second, Correll's new psychiatric evidence also would not have significantly helped his case. The district court found that "there is insufficient evidence to support that Petitioner has ever suffered from any major mental illness, whether PTSD [post traumatic stress disorder], a major depressive disorder, or a bipolar disorder." The district court reached this factual finding after two psychological experts testified that there was no evidence Correll has ever suffered from these disorders. The sole witness who speculated that Correll might have suffered from post traumatic stress disorder acknowledged that such a diagnosis was "only a possibility." The district court found Correll's self-reporting of bipolar disorder and severe depression incredible in light of Correll's obvious motive to fabricate and in light of the fact that these diagnoses do not appear in his records and Correll indicated that he was never given medication to treat them.

The district court also found that the evidence did not support Correll's contention that he was given anti-psychotic medications while in custody. In reaching this factual finding, the district court noted that the mental health experts for both parties scrutinized Correll's medical records from the California Department of Corrections ("CDC") and reported the absence of any indication that anti-psychotic medication was ever prescribed. Although it appears that Correll was given Mellaril for a period of time as a juvenile, the government's mental health expert, Dr. John Scialli, M.D., testified without opposition that the dosage—25 milligrams—would have served as a mild tranquilizer and was far lower than the dosage that would be utilized to counteract psychosis (approximately 625 milligrams).

Accordingly, had Correll's attorney thoroughly reviewed Correll's mental health records, he would have only had credible evidence for the diagnosis he already suspected: antisocial personality disorder accompanied by mild depression. As

we have previously noted, an antisocial personality disorder diagnosis may be "potentially more harmful to [a] petitioner than [helpful]." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1035 (9th Cir. 1997). We have "agree[d] with the Arizona Supreme Court that this evidence has obvious countervailing tactical dangers," because "[i]n its best possible light, it is a basket of cobras." *Id*. "Accordingly, [in a prior case,] we c[ould] identify no prejudice flowing from counsel's failure to develop" psychiatric testimony relating to a defendant's antisocial personality disorder. *Id*.; *see also Darden*, 477 U.S. at 186-87 (counsel's decision not to present character or mental-state evidence in mitigation was sound trial strategy because the mitigating evidence would have opened the door to damaging rebuttal evidence, which included a psychiatric opinion that the defendant had a sociopathic personality); *Clabourne v. Lewis*, 64 F.3d 1373, 1384 (9th Cir. 1995) (noting that mental health records omitted from the sentencing hearing "hardly turned out to be helpful" because they indicated that the defendant had "an antisocial personality"); *Daniels v. Woodford*, 428 F.3d 1181, 1204, 1210 (9th Cir. 2005) (indicating that testimony suggesting that a capital defendant is a "sociopath" is aggravating rather than mitigating); *Caro v. Woodford*, 280 F.3d 1247, 1257 (9th Cir. 2002) (concluding that a psychologist's testimony did not help the defendant's mitigation case because it tended "to paint him as a violent psychopath"); *Beardslee v. Woodford*, 358 F.3d 560, 583 (9th Cir. 2004) (acknowledging that an antisocial personality diagnosis can be damaging to a capital defendant); *Williams v. Calderon*, 52 F.3d 1465, 1472 (9th Cir. 1995) ("We have no doubt that . . . statements [suggesting that the defendant is sociopathic] did nothing to advance Williams's cause.").

Furthermore, had Correll's attorney presented Correll's mental health records at sentencing, he would have opened the door for the prosecution to present extremely damaging rebuttal evidence that would have likely eviscerated the minimal mitigating impact these records carried. The district court found that, had Correll's attorney presented mental health evi-

dence, the "highly skilled" prosecutor would have presented the following evidence that was not already before the sentencing judge:

> (i) Petitioner's rape of a female psychotic patient while he was undergoing mental health treatment for his antisocial personality disorder and mild depression; (ii) Petitioner's numerous escapes from mental health treatment facilities and rejections of institutional efforts to provide him with mental health treatment; (iii) Petitioner's hostage taking and armed aggression against mental health workers in an escape attempt from a mental health treatment facility; (iv) the underlying factual basis of Petitioner's prior convictions for armed robbery; . . . (viii) the conclusion of a social evaluation at age 18 that Petitioner was not a candidate for probation and was a danger to the community; (ix) additional information showing the efforts of Petitioner's parents to deal with his drug abuse problem and obtain psychological treatment for him following his armed threat against a teacher at school; (x) that Petitioner had no desire to work but only wished to enjoy himself; and (xi) Petitioner's statement that when he committed the 1978 armed robberies that it gave him a strong sense of power and excitement.

The district court "credit[ed counsel's] testimony that the prosecutor, Sidney Davis, had a reputation for excellent preparation and that she would have left no stone unturned in her opportunity to rebut any mitigation evidence presented."

Additionally, presentation of Correll's antisocial personality disorder at sentencing would have severely undermined counsel's strategy of arguing that Correll merely followed Nabors's lead during the crimes. The antisocial personality diagnosis would have almost certainly prompted the government to point out that Correll, at age 18, was the instigator of

an armed robbery in which he enlisted the assistance of his 13-year-old brother and 15-year old girlfriend. *See Bonin*, 59 F.3d at 836 (finding that the failure to present expert psychological testimony was not prejudicial because it "would have distracted jurors from [counsel's main mitigation] theory and [other] mitigation evidence, reduced [the defendant's] credibility with the jury, and opened the door to powerful cross-examination and rebuttal"); *Burger*, 483 U.S. at 793 (holding that a petitioner failed to prove ineffective assistance where the affidavits detailing the defendant's behavioral history his attorney failed to present "are by no means uniformly helpful to petitioner because they suggest violent tendencies that are at odds with the defense's strategy of portraying petitioner's actions on the night of the murder as the result of [another person's] strong influence upon his will").

In sum, the psychological evidence, if presented, would have demonstrated only that Correll has an antisocial personality with mild depression. Evidence of an antisocial personality would have had tremendous potential to be more harmful than helpful. In addition, this evidence would have opened the door for the prosecution to introduce a laundry list of extremely damaging information not already before the sentencing judge and would have crippled Correll's chances of convincing the sentencing judge that he was merely following Nabors's lead during the crimes.[16] Accordingly, contrary to

---

[16]The majority concludes that "a significant portion of that damaging rebuttal evidence was already available through the pre-sentence report." Maj. Op. at 17150. But, as discussed at length in this dissent, defense counsel realized the introduction of some potentially mitigating evidence would open the door to a parade of horribles. For example, while the pre-sentence report summarily discloses Correll's conviction of three counts of armed robbery in 1978, defense counsel understandably wanted to preclude damning rebuttal evidence revealing that Correll enlisted his 13-year-old younger brother and his 15-year-old girlfriend in the robbery of the three convenience stores at gunpoint. Furthermore, the pre-sentence report is silent regarding other extremely damaging information that the prosecutor would have surely brought to light in rebutting certain potentially mitigating evidence.

the majority's conclusion, Correll cannot prove a reasonable probability that he would have received a lesser sentence if the available psychological evidence had been before the sentencing judge.

C

As to Correll's drug use, the district court found that there was no evidence—other than Correll's self-serving statements —that Correll was significantly impaired at the time of the crimes. Arizona law at the time provided that "[a] defendant's intoxication or alcoholism at the time of the offense is a mitigating circumstance *if* the evidence shows that it significantly impaired the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." *State v. Zaragoza*, 659 P.2d 22, 30 (Ariz. 1983) (emphasis added). The district court found that Correll's behavior during the murders indicated he was not intoxicated:

> [I]t was Petitioner who remained calm when the gun misfired as Nabors was trying to kill Robin Cady. It was Petitioner who encouraged Nabors to remain calm as there were no cars coming, to get a shell chambered and shoot Cady. Such behavior at the time of the crime does not demonstrate intoxication and, in fact, undercuts an assertion of intoxication.

*See Williams v. Woodford*, 384 F.3d 567, 624 (9th Cir. 2004) (reasoning that there is little basis for believing that drugs materially affected the defendant's behavior at the time of the crimes when the facts of the crimes reflect deliberate and methodical action).

No witnesses could have testified that Correll was intoxicated during the crimes and only one witness, Correll's sister, could have testified that Correll used methamphetamine in the morning of the day prior to the crime. Correll was not preju-

diced by his sister's failure to testify, however, because her testimony, on cross-examination, would have eviscerated any remaining residual doubt in the sentencing judge's mind as to Correll's guilt. As the district court found, her "testimony would have totally eliminated any mitigating weight from Petitioner's claim of innocence and residual doubt (i.e., the guilt phase misidentification defense)." She knew Correll was with Nabors when the crimes occurred and that they had sought a ride out of the state very soon after the murders occurred. *See Allen*, 395 F.3d at 1004 (explaining that "mitigation witnesses proffered by [the defendant] would not have proved helpful given their own involvement in [the defendant]'s criminal enterprise."); *Williams v. Woodford*, 384 F.3d 567, 624 (9th Cir. 2004) ("[T]he best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence strictly speaking. The best thing he can do, all else being equal, is to raise doubt about his guilt.").

The only other witness Correll's postconviction counsel presented relating to drug use was Dawn Day, who testified that she used methamphetamine with Correll during a four month period from November 1982 until February 1983. We cannot consider Day's testimony, however, because Correll failed to establish that Day was available to testify at his sentencing hearing. *See Douglas*, 316 F.3d at 1086 n. 2 (explaining that testimony presented at a district court evidentiary hearing that was not available to counsel at the sentencing hearing may not be considered for prejudice purposes). Furthermore, even had Correll established that Day would been available, Day's testimony that Correll used methamphetamine more than a year before the crime would have provided little support for an argument that Correll, at the time of the crime, was so impaired that he was unable "to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." *Zaragoza*, 659 P.2d at 30.

Finally, the district court reasonably declined to credit Correll's two drug abuse experts' opinions on the effects of

severe methamphetamine addiction because these opinions
were not based on an examination of Correll but instead were
based on a hypothetical set of facts provided by Correll's
postconviction counsel. As the district court explained:

> Dr. Sullivan did not examine Petitioner nor did he
> look at Petitioner's Arizona Department of Correc-
> tions or CDOC records. Rather, Dr. Sullivan was
> asked to assume [a set of] hypothetical facts [that] do
> not accurately or reliably portray Petitioner's alleged
> drug abuse. . . . [H]is opinion was based on unsub-
> stantiated and unreliable assumptions.

In stark contract to the hypothetical assumptions on which Dr.
Sullivan's opinion was based, the district court found that
Correll was incarcerated, except for 229 days, during the nine
year period between October 1975 (when Correll was first
incarcerated, at age 14) and March 1984 (the month before
the crime) and that "Petitioner was not a methamphetamine
addict or a long-term abuser of methamphetamine during the
time he was incarcerated." The district court further
explained:

> The Court does not credit Petitioner's unsubstan-
> tiated self-report that he abused methamphetamine
> every day before the crimes were committed. Peti-
> tioner chose not to testify at the evidentiary hearing;
> Petitioner chose not to fully cooperate with [the gov-
> ernment's drug abuse expert's] examination of him
> regarding the issue of drug abuse. Because of the
> obvious motive to fabricate, Petitioner's self-serving
> statements about his drug usage prior to the crimes
> is [sic] unreliable and subject to searching skepti-
> cism. *See, e.g.,* [*State v.*] *Medrano*, 914 P.2d [192,]
> 227 [(Ariz. 1996) ("the defendant provided most of
> the information concerning his use of cocaine in the
> past and on the night of the murder, as well as the
> drug's effect on him. Because of the obvious motive

to fabricate, such self-serving testimony is subject to skepticism and may be deemed insufficient to establish mitigation.")]; *see also Bernard Smith* [*v. Stewart*], 140 F.3d [1263,] 1270 [1998] (evaluating evidence based on impartial sentencing judge applying Arizona law); *see generally, Strickland*, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decision maker is reasonably, conscientiously, and impartially applying the standards that govern the decision."). The Court's searching skepticism toward Petitioner's self report is corroborated by Respondent's drug abuse expert, Dr. Matthews, who opined as follows: "Antisocial personality disorder is characterized by malingering and deceit; instances of [Petitioner's] lifelong pattern of deceptiveness abound throughout his penal and other records. He has been deceitful about a great many matters, including his history of substance abuse. Because of [Petitioner's] history of deceit, it is a major clinical error to accept [Petitioner's] self-serving view of his condition at the time of the offense as accurate."

Furthermore, Correll's other expert witness on drug addiction, Dr. Shaw, whom the majority quotes for the proposition that Correll "may have been experiencing drug-induced paranoia" at the time of the murders, Maj. Op. at 17143, was "thoroughly impeached" at the evidentiary hearing. As the district court explained, "Dr. Shaw admitted that he only minimally considered the facts of the crime before reaching his conclusion." The district court found Dr. Shaw's opinion "entirely not credible and wholly speculative" because it, like Dr. Sullivan's opinion, was "based upon hypothetical drug usage at the time of the crimes that was not established."

Based on the foregoing, I agree with the district court that, under the facts of this case, counsel's failure to present evidence regarding Correll's drug use—other than counsel's

statement that Correll had been using alcohol and drugs and Snelling's statement that he smelled alcohol on his captor's breath—was not prejudicial. I agree with the district court's conclusion that if Correll's attorney had called an expert to testify, "it is highly likely any lay witness basis for the expert's opinion could have been cross-examined at sentencing and impeached by virtue of the fact that no lay witness could testify that Petitioner was intoxicated at the time of the crimes." I also credit the district court's observation that "if an expert had testified based solely on Petitioner's self-reporting . . . it is very likely that the expert's opinion would have been severely undermined by undisputed evidence that Petitioner had spent almost 9 of the last 10 years incarcerated with little or no access to drugs."[17] I accordingly cannot agree with majority's conclusion that Correll has met his burden to prove that, had counsel presented more detailed evidence about his drug use, he would have received a lesser sentence.

## D

Finally, Correll has presented no credible evidence about his childhood that his attorney could have placed before the sentencing judge other than the evidence the sentencing judge already had before him. The district court, who is in the best position to determine credibility, found Correll's uncorroborated allegation that his mother banged his head against a kitchen table incredible. In regard to the head injury Correll

---

[17]I would further note that a drug defense likely would have evoked less sympathy from an Arizona sentencing judge 22 years ago than it does from the court today. *See Mayfield v. Woodford*, 270 F.3d 915, 931 (9th Cir. 2001) (crediting testimony that there were "no death penalty cases tried in San Bernardino County prior to 1983 where a drug defense had been successful in gaining either an acquittal or in reducing the sentence from death to life without parole."). The sentencing judge likely would have taken note of the fact that Correll never sought treatment for his substance abuse problem and repeatedly secured his removal from the mental health programs in which he was placed either by escaping or by violently assaulting the staff.

suffered at age seven when a cinder block wall fell on him, the district court expressly found that Correll's parents were not negligent in securing medical care. Based on the medical records presented at the evidentiary hearing, the district court found that Correll's parents took him to the family doctor the day the accident occurred and "acted reasonably in caring for Petitioner, which included two visits to their family doctor, one emergency room visit and a follow-up visit for additional specialized testing."

The remaining family history evidence the majority cites comes from Reverend Curry, whom the district court found "was not an available witness" for counsel at the time of the sentencing hearing. The district court found "that if [Reverend Curry] had been contacted by [counsel] prior to sentencing, he would have informed him that he would not discuss information about Petitioner or appear at sentencing because it was against California law for him to discuss former residents of the CYA."[18] Accordingly, Reverend Curry's testimony cannot factor into the prejudice analysis. *See Douglas*, 316 F.3d at 1086 (explaining that testimony presented at a district court evidentiary hearing that was not available to counsel at the sentencing hearing may not be considered for prejudice purposes).

The district court further found that had counsel emphasized Correll's parents' use of corporal punishment, the prose-

---

[18]While the majority quotes Reverend Curry's testimony that he "would have unhesitatingly come to help" Correll, *see* Maj. Op. at 17137 n.3, I credit the district court's finding that at the time of the sentencing hearing he was unavailable to help. Reverend Curry testified that he "cannot offer testimony or assertions regarding people who have been in California Youth Authority [because] [i]t is forbidden by law." Reverend Curry testified that others "may contact me," but he "could not make contact with" counsel and when he "talked with [his] supervisors about it, . . . they said no." Furthermore, defense counsel testified that when he contacted Reverend Curry's wife, she informed him that the Reverend "didn't really want to be involved."

cution would have countered with evidence that Correll's parents took him to a private psychologist and participated in a six-month treatment program with him after he was expelled from eighth grade for threatening a teacher with a knife. The prosecution likely also would have presented evidence that Correll had repeatedly molested his sister. Accordingly, on balance, presentation of family history evidence would have been counterproductive. I cannot agree with the majority's conclusion that Correll has met his burden to prove that, had counsel presented more detailed evidence about his childhood, he would have received a lesser sentence.

### III

The sum of the majority's analysis in this case simply eviscerates the requirement that a habeas petitioner prove prejudice in order to prevail on a claim for ineffective assistance of counsel. Not satisfied with merely reconstructing the facts, the majority also reinvents Supreme Court authority, asserting that the mitigating evidence in this case "is clearly sufficient to establish prejudice under the Supreme Court's standard in *Wiggins*, 539 U.S. at 534-38." Maj. Op. at 17143. This statement, of course, is patently absurd, as even a cursory review of the facts in *Wiggins* reveals that Correll fell drastically short of carrying the demanding burden of proving actual prejudice the Supreme Court found sufficient in that case.

In *Wiggins*, the petitioner "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother," suffered "physical torment, sexual molestation, and repeated rape" during his subsequent years in foster care, and spent time homeless. *Id.* at 512. Perhaps most crucial, the petitioner in *Wiggins* was mentally retarded. *Id.*

Correll's new evidence, which reveals that he is "a highly functioning adult," comes nowhere close to the "powerful mitigating narrative" present in *Wiggins*. *Id.* at 513. In fact,

the district judge, who is in the best position to evaluate the evidence, concluded that, when one considers both the positive and negative repercussions of Correll's new evidence, the balance of aggravation and mitigation "has barely been altered." By holding that the mitigating evidence in this case is clearly sufficient to establish prejudice under *Wiggins*, the majority essentially writes the prejudice requirement out of our circuit jurisprudence.

I respectfully dissent.